[Cite as *Heimann v. Heimann*, 2022-Ohio-241.]


IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
HANCOCK COUNTY


THOMAS M. HEIMANN,

    PLAINTIFF-APPELLEE,                  CASE NO. 5-21-11

    v.

STEPHANIE R. HEIMANN,             O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Hancock County Common Pleas Court
Domestic Relations Division
Trial Court No. 2018-DR-0242

Judgment Affirmed

Date of Decision:   January 31, 2022


APPEARANCES:

    *Robert P. Soto* **for Appellant**

    *Michael J. Malone and Frederic Matthews* **for Appellee**

**ZIMMERMAN, J.**

{¶1} Defendant-appellant, Stephanie R. Heimann ("Stephanie"), appeals the February 26, 2021 judgment entry of the Hancock County Court of Common Pleas, Domestic Relations Division, granting divorce from defendant-appellee, Thomas M. Heimann ("Thomas"). On appeal, Stephanie challenges the trial court's decisions (1) enforcing the parties' antenuptial agreement; (2) denying her request for spousal support; (3) dividing the parties' separate and marital property; and (4) disposing of her contempt motions. For the reasons that follow, we affirm.

{¶2} Thomas and Stephanie were married on June 13, 2003. (Doc. No. 1). This was a subsequent marriage for them both, and while each had children from their previous marriages, no children were born as issue of this marriage. (*Id.*); (Doc. No. 72, Ex. A). Thomas filed a complaint for divorce on June 20, 2018. (Doc. No. 1). Stephanie filed her answer along with a counterclaim for divorce on July 19, 2018. (Doc. No. 25).

{¶3} Stephanie filed a contempt motion on December 10, 2018, alleging that Thomas (1) failed to truthfully complete affidavits submitted to the trial court; (2) disposed of property in violation of the mutual restraining order; (3) locked Stephanie out of the former marital residence after moving out and conceding temporary possession to Stephanie; (4) composed a doctor's note about Stephanie and transmitted it to Stephanie's mother; and (5) failed to respond to discovery

requests over a four-month period. (Doc. No. 54). On June 27, 2019, Stephanie filed a second contempt motion, alleging that Thomas violated the trial court's mutual restraining order by loaning $250,000.00 to his son as well as the trial court's temporary orders by removing property from the marital residence and by failing to pay for certain expenses. (Doc. No. 142). On September 9, 2019, Stephanie filed a third contempt motion against Thomas for his alleged failure to pay her temporary-spousal support on July 1, 2019 as ordered by the trial court. (Doc. No. 161).

{¶4} Following a hearing on March 27, 2019 regarding Stephanie's challenge to the validity of the parties' antenuptial agreement, the trial court's magistrate concluded the antenuptial agreement to be valid on April 11, 2019. (Doc. Nos. 72, 108, 111). (*See also* Doc. Nos. 109, 110).

{¶5} After being granted an extension of time, Stephanie filed her objections to the magistrate's decision relating to the enforcement of the parties' antenuptial agreement on June 25, 2019. (Doc. Nos. 117, 125, 127, 129, 137, 141, 148). Thomas filed his response to Stephanie's objections on August 12, 2019. (Doc. Nos. 118, 157). (*See also* Doc. Nos. 143, 146, 155). The trial court issued its entry addressing Stephanie's objections and affirming the magistrate's decision on November 25, 2019. (Doc. No. 184). (*See also* Doc. No. 190).

{¶6} On May 29, 2019, the trial court's magistrate issued temporary orders in which it ordered Thomas to pay Stephanie $2,000.00 "per month in temporary

spousal support" as well as Stephanie's "mobile phone" and "out of pocket medical expenses up to" $300.00 per month. (Doc. No. 130).

{¶7} On May 8, 2019, Thomas filed a motion requesting that the trial court issue "an order setting forth a date and time upon which [Stephanie] is required to surrender to [Thomas] the former marital residence * * * ." (Doc. No. 123). Following further exchanges between the parties, the trial court's magistrate issued temporary orders on June 28, 2019 (which were affirmed by the trial court) granting Thomas's motion requesting an order for Stephanie to surrender the former marital residence, and continuing its previous temporary orders. (Doc. Nos. 124, 144, 145, 150, 154).

{¶8} On April 2, 2020, Thomas filed a motion to terminate the temporary orders requiring him to pay Stephanie $2,000.00 per month in temporary-spousal support. (Doc. No. 222). Stephanie filed a memorandum in opposition to Thomas's motion requesting that the trial court terminate its temporary orders. (Doc. No. 224). On June 5, 2020, the trial court's magistrate modified its temporary orders, though it did not terminate the order requiring Thomas to pay Stephanie $2,000.00 per month in temporary-spousal support. (Doc. No. 226). (*See also* Doc. No. 228).

{¶9} The matter came for final hearing on December 9, 2019 and February 2, 2020 on Thomas's complaint for divorce, Stephanie's counterclaim for divorce, and Stephanie's contempt motions. (Doc. No. 229). On June 5, 2020, the trial

court's magistrate issued a decision dividing the parties' assets and debts and ordering spousal support in accordance with the antenuptial agreement as well as deciding Stephanie's June 27 and September 9, 2019 contempt motions.[1] (*Id.*). Specifically, the trial court's magistrate concluded that Thomas was in contempt of the trial court's mutual restraining order by loaning $250,000.00 to his son, but that he purged the contempt. (*Id.*). As a matter of consequence, the trial court's magistrate awarded Stephanie $250.00 in attorney fees. (*Id.*). Further, the trial court's magistrate concluded that the term of Thomas and Stephanie's marriage was from June 13, 2003 to December 9, 2019. (*Id.*).

{¶10} After being granted extensions of time, Stephanie and Thomas, respectively, filed their objections to the trial court's magistrate's decision on August 14, 2020. (Doc. Nos. 231, 233, 234, 237, 240, 241, 242, 243). Thomas filed a memorandum in opposition to Stephanie's objections to the trial court's magistrate's decision on September 21, 2020. (Doc. No. 244). That same day, Stephanie filed a memorandum in opposition to Thomas's objections to the trial court's magistrate's decision. (Doc. No. 245). The trial court issued its entry addressing the parties' objections to the magistrate's decision in which it affirmed

---

[1] Even though the trial court did not dispose of Stephanie's contempt motion filed on December 10, 2018, Stephanie waived the trial court's failure to rule on this motion at oral argument. Nevertheless, "[i]t is well-established that when a trial court fails to rule on a motion, the appellate court will presume the trial court overruled the motion." *Willis v. Willis*, 149 Ohio App.3d 50, 2002-Ohio-3716, ¶ 63 (12th Dist.), citing *Dozer v. Dozer*, 88 Ohio App.3d 296, 303 (4th Dist.1993).

"the Magistrate's Decision in total, with the notable modification that [Thomas] shall pay directly to [Stephanie] the sum of $4,700.00 in satisfaction of his requirement to pay one-half (1/2) of the Chase account." (Doc. No. 248).

{¶11} The trial court issued a final divorce decree on February 26, 2021. (Doc. No. 251).

{¶12} Stephanie filed her notice of appeal on March 25, 2021. (Doc. No. 260). She raises four assignments of error for our review. For ease of our discussion, we will discuss Stephanie's first and second assignments of error together, followed by her third and fourth assignments of error.

**Assignment of Error No. I**

**The Trial Court Abused Its Discretion and Committed Reversible Error When it Upheld the Preuptial [sic] Agreement.**

**Assignment of Error No. II**

**The Trial Court Abused Its Discretion and Committed Reversible Error In Denying An Award of Permanent or Temporary Spousal Support.**

{¶13} In her first and second assignments of error, Stephanie argues that the trial court abused its discretion by concluding that the parties' antenuptial agreement is enforceable. Specifically, Stephanie argues under her first assignment of error that the parties' antenuptial agreement is unenforceable based on overreaching and coercion and because it provides a disproportionate division of assets. Stephanie argues under her second assignment of error that the trial court failed to consider

whether the provision in the parties' antenuptial agreement regarding spousal support was unconscionable at the time of the parties' divorce.

*Standard of Review*

**{¶14}** "The validity of an antenuptial agreement is a question of fact for the trial court, and the trial court's decision will not be reversed absent an abuse of discretion." *Vanderink v. Vanderink*, 5th Dist. Licking No. 17 CA 0091, 2018-Ohio-3328, ¶ 19, citing *Bisker v. Bisker*, 69 Ohio St.3d 608, 609-610 (1994). *See also Parrett v. Wright*, 2d Dist. Clark No. 2017-CA-59, 2017-Ohio-9057, ¶ 19. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶15}** "This court will not reweigh the evidence introduced in a trial court." *Fletcher v. Fletcher*, 68 Ohio St.3d 464, 468 (1994). Rather, we will affirm a trial court's decision regarding the enforceability of an antenuptial agreement "when the record contains some competent evidence" to support it. *Id. See also Vanderink* at ¶ 19; *Grimm v. Grimm*, 12th Dist. Butler No. CA2002-04-089, 2003-Ohio-80, ¶ 16.

*Analysis*

**{¶16}** "It is well settled in Ohio that public policy allows the enforcement of prenuptial agreements." *Fletcher* at 466.

> The Supreme Court [of Ohio] has held that "[s]uch agreements are valid and enforceable (1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value

and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce."

*Johnson v. Johnson*, 2d Dist. Miami No. 2010 CA 2, 2011-Ohio-500, ¶ 10, quoting *Gross v. Gross*, 11 Ohio St.3d 99 (1984), paragraph two of the syllabus. "Provisions in the antenuptial agreement which address spousal support 'must meet the additional test of conscionability at the time of the divorce or separation.'" *Mann v. Mann*, 9th Dist. Lorain No. 09CA009685, 2010-Ohio-1489, ¶ 8, quoting *Gross* at paragraph four of the syllabus.

> When an antenuptial agreement provides disproportionately less than the party challenging it would have received under an equitable distribution, the burden is on the one claiming the validity of the contract to show that the other party entered into it with the benefit of full knowledge or disclosure of the assets of the proponent. The burden of proving fraud, duress, coercion or overreaching, however, remains with the party challenging the agreement.

*Fletcher* at 467.

{¶17} On appeal, Stephanie contends under her first assignment of error that the parties' antenuptial agreement is unenforceable based on overreaching and coercion and because it provides a disproportionate division of assets. We will begin by addressing whether the trial court abused its discretion by concluding that the parties' antenuptial agreement is enforceable because Stephanie did not meet her burden of proving that Thomas engaged in overreaching or coercion.

{¶18} For purposes of determining the enforceability of an antenuptial agreement, the terms fraud, duress, coercion, and overreaching are given their

generally accepted meanings. *Fordeley v. Fordeley*, 11th Dist. Trumbull No. 2018-T-0006, 2020-Ohio-5380, ¶ 27, citing *Vlad v. Vlad*, 11th Dist. Trumbull No. 2003-T-0126, 2005-Ohio-2080, ¶ 53, citing *Gross* at 105. As relevant here, the Supreme Court of Ohio defined "overreaching" to mean "one party outwitting or cheating the other 'by artifice or cunning, or by exploiting a significant disparity in understanding the nature of the transaction.'" *Fletcher* at 467, quoting *Gross* at 105. "'Coercion is defined as "where one party is constrained by subjugation to [an]other to do what his free will would refuse."'" *Fordeley* at ¶ 27, quoting *Baumgartner v. Baumgartner*, 6th Dist. Lucas No. L-88-032, 1989 WL 80947, *10 (July 21, 1989), quoting *Black's Law Dictionary* 234 (5th Ed.1979).

{¶19} When considering whether a party engaged in overreaching, "the outcome of the analysis often turns on whether the challenging party had an opportunity to meet with counsel prior to execution." *Id.* at ¶ 24, citing *Fletcher* at 470. Furthermore, [t]he presentation of an agreement a very short time before the wedding ceremony will create a presumption of overreaching or coercion if * * * the postponement of the wedding would cause significant hardship, embarrassment or emotional stress." *Fletcher* at 470. *See also In re Estate of Gates v. Gates*, 7th Dist. Columbiana No. 06 CO 60, 2007-Ohio-5040, ¶ 40. "Courts therefore look to the totality of the surrounding circumstances when considering the existence of duress, coercion, fraud, or overreaching, including knowledge of the nature of the

agreement and whether the agreement was presented for signature in close proximity to the scheduled wedding." *Vanderbilt v. Vanderbilt*, 9th Dist. Medina Nos. 11CA0103-M and 11CA0104-M, 2013-Ohio-1222, ¶ 16.

{¶20} Here, there is no dispute that Stephanie was represented by counsel during the antenuptial-agreement negotiations. Instead, Stephanie contends that a "lack of communication with her attorney and the sudden change of counsel" on the day that she executed the agreement resulted in her having inadequate "representation for the parties' Antenuptial Agreement." (Appellant's Brief at 3). Stephanie further contends that the antenuptial agreement is unenforceable due to overreaching because she "was not an active participate in the negotiations" since there is "no evidence to suggest that [she] was involved in the alleged negotiations." (*Id.* at 2).

{¶21} Moreover, Stephanie argues that the antenuptial agreement is unenforceable because she was coerced into executing the agreement since, "at the time of signing, [Thomas] had informed her that Antenuptial Agreement was for her benefit, that the values on the schedules were irrelevant, and he would provide her just as her [sic] did for his ex-wife in the event of a divorce." (*Id.* at 3, citing Mar. 27, 2019 Tr. at 23, 27). She contends that Thomas coerced her into executing the agreement by making these oral promises and failing "to mention that his first marriage did not have a prenuptial agreement." (*Id.*).

{¶22} At the March 27, 2019 hearing, Stephanie testified that she met with her attorney "[t]wice" before executing the antenuptial agreement and that she understood the agreement when she executed it. (Mar. 27, 2019 Tr. at 60-61). Although Stephanie testified that an attorney other than the attorney she met with signed the antenuptial agreement on her behalf, she further testified that she recalled negotiating portions of the agreement with her attorney. (*Id.* at 60).

{¶23} Furthermore, Stephanie testified that Thomas influenced her to execute the agreement by "telling [her] that [she] wouldn't have to worry because" of "everything he did for" his ex-wife. (*Id.* at 61). Likewise, Stephanie testified that, when she "questioned" Thomas regarding the valuation of the assets that he included in the agreement, "he said the numbers don't really matter." (*Id.* at 62).

{¶24} On cross-examination, Stephanie testified that she and Thomas were married on June 13, 2003. (*Id.* at 21). Stephanie testified that she and Thomas negotiated the antenuptial agreement for "over a year before it was actually signed" and that she and Thomas married six months *after* she executed the antenuptial agreement. (*Id.* at 21-22). Moreover, even though she testified that she was unaware that her attorney and Thomas's attorney exchanged correspondence regarding the antenuptial agreement, Stephanie identified Plaintiff's Exhibit 11 as correspondence between the attorneys regarding the agreement. (*Id.* at 12). Stephanie testified that the antenuptial agreement reflects "a listing of the assets that [Thomas] owned and

* * * what he owed at the time of [the] agreement" but that it was not "not an accurate disclosure * * * of what he owned and what he owed." (*Id.* at 22). Notwithstanding her belief of the inaccuracy, Stephanie testified that she executed the agreement because Thomas "said it didn't matter." (*Id.* at 23). Importantly, Stephanie further testified that Thomas did *not* coerce or force her to execute the antenuptial agreement. (*Id.* at 27).

{¶25} In the April 11, 2019 decision, the trial court's magistrate concluded "that the parties entered into the [antenuptial] agreement freely without fraud, duress, coercion, or overreaching." (Doc. No. 111). In concluding that the parties' entered the antenuptial agreement freely without fraud, duress, coercion, or overreaching, the trial court's magistrate found that Stephanie signed the agreement on December 5, 2002 in Auglaize County, Ohio, while Thomas signed the agreement on December 18, 2002 in Hancock County, Ohio. "The parties married six months later, on June 13, 2003." (Doc. No. 111).

{¶26} Moreover, the trial court's magistrate found that Thomas and Stephanie actively engaged in negotiations for an antenuptial agreement for 18 months. The trial court's magistrate further found that "[t]he attorneys' communications show a prior professional relationship between [Stephanie] and [her attorney], and display arms-length negotiations between the parties' attorneys." (*Id.*). Additionally, the trial court's magistrate found that Stephanie "understood the

agreement" at the time she executed it and that Thomas "did not force her to sign the agreement." (*Id.*). Furthermore, the trial court's magistrate found that there was no evidence presented that Thomas was present when Stephanie executed the antenuptial agreement or that Stephanie "asked to delay the signing to allow for [her attorney's] presence." (*Id.*).

{¶27} Addressing Stephanie's argument that she did not freely enter the antenuptial agreement as a result of Thomas's oral promises, the trial court's magistrate found that "[o]ther than her selective recollections, the evidence also does not establish that [Stephanie] relied on any oral promises when entering into the written agreement." (*Id.*). In particular, the trial court's magistrate found that Stephanie did not relay Thomas's oral promises to her attorney or request that they be included in the agreement.

{¶28} In its November 25, 2019 decision overruling Stephanie's objections to the magistrate's decision relating to the enforcement of the antenuptial agreement, the trial court also concluded that the parties' entered the antenuptial agreement freely without fraud, duress, coercion, or overreaching. The trial court found, in relevant part, that "[t]he parties began to negotiate the agreement over a year before the marriage" and that they exchanged multiple letters with modifications to the agreement. (Doc. No. 184). The trial court found that the "signing of the agreement occurred more than six (6) months before the date of the

-13-

wedding, indicating that there was plenty of time to delay the signing if [Stephanie] had desired to do so." (*Id.*). Further, the trial court found that the parties acknowledged a provision within the agreement "that they were represented by counsel, that they were satisfied with counsel, and that they each understood the terms of the agreement." (*Id.*). Finally, regarding Stephanie's argument that she was induced to execute the agreement based on Thomas's oral promises, the trial court found that Stephanie failed to meet her burden of proving that they "resulted in coercion, duress, or any other negative influence." (*Id.*).

{¶29} Based on our review of the record, there is some competent evidence supporting the trial court's conclusion that the parties entered the antenuptial agreement freely without coercion or overreaching. Importantly, contrary to Stephanie's arguments on appeal, Stephanie conceded at the March 27, 2019 hearing that Thomas did not coerce her to execute the antenuptial agreement. (*See* Mar. 27, 2019 Tr. at 27).

{¶30} Moreover, Stephanie failed to prove that coercion or overreaching occurred under the facts presented. Indeed, because the parties' marriage did not occur until more than six months after the execution of the antenuptial agreement, Stephanie had ample time to pursue changes to the agreement, to retain new counsel, or to refuse to sign it if she was unsatisfied with the terms of the agreement. *Compare Millstein v. Millstein*, 8th Dist. Cuyahoga No. 79617, 2002-Ohio-4783, ¶

63 (noting that "if unhappy with the terms of the agreement, Dianne had ample time to pursue changes, to retain new counsel, or to refuse to sign it"). Stephanie chose not to.

**{¶31}** Furthermore, Stephanie's contention that the agreement should be unenforceable because she "was not an active participate in the negotiations" since there is "no evidence to suggest that [she] was involved in the alleged negotiations" is belied by her testimony that she recalled negotiating certain terms of the agreement with her attorney. *Compare Vanderbilt*, 2013-Ohio-1222, at ¶ 17 ("Her recitation of the events surrounding the signing of the agreement, however, does not convey the full sense of the testimony at trial.").

**{¶32}** Notwithstanding Stephanie's admission that she was not coerced by Thomas into executing the agreement, Stephanie's coercion argument is likewise negated by the record. Specifically, the trial court's magistrate (and the trial court) credited Thomas' testimony that he relayed to Stephanie (prior to their marriage) that "if [he] ever got married again [he] would definitely want to have a Prenuptial Agreement * * * ." (Mar. 27, 2019 Tr. at 33). *See, e.g.*, *Gates*, 2007-Ohio-5040, at ¶ 43 (noting that the trial court is "in the best position to view the witnesses, observe their demeanor, gestures, voice inflections and use these observations in weighing the credibility of the proffered testimony"). In other words, contrary to Stephanie's argument, Thomas made it clear to Stephanie that his first marriage was *not* subject

to an antenuptial agreement. In sum, that Stephanie cannot recall negotiating (or chose not to negotiate) specific terms that she contends are now relevant to her case does not negate the enforceability of the agreement.

{¶33} Having determined that Thomas did not overreach or coerce Stephanie into executing the agreement, we turn to Stephanie's argument that it is unenforceable because it provides a disproportionate division of assets. An antenuptial "agreement that is freely and voluntarily entered into after full disclosure of a spouse's property will not be invalidated because it makes a disproportionate distribution." *Johnson*, 2011-Ohio-500, at ¶ 12, citing *Fletcher*, 68 Ohio St.3d at 466. "'[F]ull disclosure' is satisfied 'either by the exhibiting of the attachment to the antenuptial agreement of a listing of the assets of the parties to the agreement, or alternatively a showing that there had been a full disclosure by other means.'" *Vanderbilt* at ¶ 10, quoting *Gross*, 11 Ohio St.3d at 105. *See also Gates* at ¶ 56 (noting "that a spouse's general knowledge of the character and extent of the other's wealth and assets is sufficient to validate a premarital agreement"). Even though disclosure should be full, fair, and open, it need not be a drastically sweeping disclosure—that is, the spouse need not know the other's *exact* means as long as he or she has a general idea of his or her wealth and assets. *Gates* at ¶ 58. *See also Millstein*, 2002-Ohio-4783, at ¶ 84 (holding "that the full disclose requirement set

forth in *Gross* is satisfied if the spouse challenging a prenuptial agreement has a general knowledge of the nature and extent of the other's wealth and assets").

{¶34} Here, Stephanie contends that the antenuptial agreement is invalid because it provides disproportionately less than she would have received under an equitable distribution and that the trial court erred in concluding that Thomas met his burden of proving that Stephanie entered the agreement with the benefit of full knowledge or disclosure of the nature of Thomas's assets and wealth. Specifically, Stephanie argues that Thomas failed to disclose the value of his business because "the value of [his] business is not clear to anyone." (Appellant's Brief at 5).

{¶35} In the April 11, 2019 decision, the trial court's magistrate concluded that "the parties each had full knowledge and understanding of the nature, value and extent of the other spouse's property." (Doc. No. 111). Specifically, the trial court's magistrate found that "the parties' Antenuptial Agreement includes disclosure of assets." (*Id.*).

{¶36} Likewise, in its November 25, 2019 decision, the trial court overruled Stephanie's objections to the magistrate's decision after concluding that Thomas met his burden of proving that he fully disclosed the nature of his assets and wealth. The trial court found that Exhibit A (to the parties' antenuptial agreement) lists "the approximate gross values and any encumbrances upon the property, resulting in a net value determination of the pre-marital assets." (Doc. No. 184). Furthermore,

the trial court found that "there is no evidence that either party disputed the purported values of the other's property" at the March 27, 2019 hearing, despite Stephanie's argument "as to how the business was valued evidences a lack of full disclosure." (*Id.*). The trial court found that, "although [Thomas] could not recall the exact method of valuation, he testified that his accountant performed the valuation, indicating that the valuation was not simply a guess or best estimate." (*Id.*).

{¶37} The record reveals that there is some competent evidence supporting the trial court's conclusion that Thomas met his burden of proving that he fully disclosed the nature of his assets and wealth—namely, the value of his business. Indeed, in addition to the value of the business included in an attachment to the parties' antenuptial agreement, Thomas testified at the March 27, 2019 hearing that "[t]he business was * * * supported by a balance sheet to show what the business was worth"—that is, the "stated" value of the company and the "goodwill" value of the company—and that "[n]obody argued about any of the numbers on that balance sheet." (Mar. 27, 2019 Tr. at 41). Furthermore, Thomas testified that he did not think that any of the valuations included in the attachment were inaccurate. (*Id.* at 42).

{¶38} On cross-examination, Thomas testified that the "goodwill" value of the company "is determined by what * * * the market would determine that the value

in excess of the book value as to what it would actually sell for at the time." (*Id.* at 46). According to Thomas, the valuation of the company was generated by an accountant. (*Id.* at 47). Importantly, the parties' antenuptial agreement states that

> [i]t is understood that the figures and amounts contained in Exhibit A * * * are approximately correct and not necessarily exact, but are intended to be reasonably accurate based upon current market values. Each party understands that the other is entering into this agreement with the understanding that such statements do in fact constitute such full disclosure.

(Mar. 27, 2019 Tr., Defendant's Ex. B).

{**¶39**} Thus, contrary to Stephanie's argument that some precise formula must be applied to determine the valuation of Thomas's business, the record demonstrates that Stephanie had a general knowledge of the nature and extent of the value of Thomas's business. *Accord Millstein*, 2002-Ohio-4783, at ¶ 84 ("In this case, the record demonstrates that, at the time she signed the agreement, Dianne had a general knowledge of the nature and extent of Norman's wealth."). *See also Gates*, 207-Ohio-5040, at ¶ 62. Moreover, the record reveals that Stephanie and Thomas not only negotiated the antenuptial agreement for 18 months before they were married, but that they had known each other for nearly eight years prior to their marriage. *See Millstein* at ¶ 84. Therefore, we conclude that Thomas fully disclosed the value of his business. *See Gates* at ¶ 63.

{**¶40**} In sum, even though we conclude that Thomas fully disclosed the value of his business, we acknowledge that the thrust of Stephanie's disagreement

is with the disproportionate distribution of assets under the antenuptial agreement. However, "contrary to statutory authority which would provide for a more equitable distribution," "we are also cognizant that virtually every prenuptial agreement provides for the disproportionate distribution of assets in favor of the spouse who brings those assets to the marriage." *Millstein* at ¶ 87. "This is the very purpose of a prenuptial agreement—to avoid by contract the equitable distribution of property mandated by statute. Therefore, while we understand this argument, it is not well taken." *Id.*

{¶41} In addition to those reasons for challenging the enforceability of the agreement, Stephanie further contends that the agreement is unenforceable because Thomas failed "to perform a promise made in [the] antenuptial agreement * * * ." (Appellant's Brief at 6). Specifically, Stephanie contends that the agreement should be invalid since it required Thomas to "quit claim to [her] and him * * * as joint tenants with right of survivorship, his residence * * * ," and Thomas executed a quit-claim deed without a right of survivorship. (*Id.* at 7). Likewise, Stephanie argues that "the parties did not follow Section 15 of the agreement regarding payment of various expenses." (*Id.*). Stephanie's argument lacks merit.

{¶42} "Though generally governed by principles of contract law, a strict application of the law of contracts is not appropriate given the specialized nature of prenuptial agreements." *Saari v. Saari*, 9th Dist. Lorain No. 08CA009507, 2009-

Ohio-4940, ¶ 10, citing *Gross*, 11 Ohio St.3d at 107. When interpreting an antenuptial agreement, the primary role of the court is to ascertain and to give effect to the intent of the parties. *Johnson*, 2011-Ohio-500, at ¶ 11. If it is clear and unambiguous, "'then its interpretation is a matter of law and there is no issue of fact to be determined.'" *Barhorst, Inc. v. Hanson Pipe & Prods. Ohio, Inc.*, 169 Ohio App.3d 778, 2006-Ohio-6858, ¶ 10 (3d Dist.), quoting *Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.*, 15 Ohio St.3d 321, 322 (1984). *See also Johnson* at ¶ 11. In that case, we apply a de novo standard of review. *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, ¶ 38, citing *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108 (1995). "The meaning of an ambiguous [agreement], however, is an issue of fact to be decided by the trier of fact." *Westlake v. VWS, Inc.*, 8th Dist. Cuyahoga No. 100180, 2014-Ohio-1833, ¶ 34. "We will affirm a trial court's interpretation of such [an agreement] if the record contains competent evidence to support it." *Johnson* at ¶ 10. *See also Fletcher*, 68 Ohio St.3d at 468.

{¶43} Here, the trial court's magistrate concluded in the April 11, 2019 decision that Thomas "did not fail to perform his responsibility under the agreement" because "[a] survivorship deed * * * is not necessary to accomplish the purpose of the real estate provision of the antenuptial agreement." (Doc. No. 111).

The trial court's magistrate did not address Stephanie's contention regarding Section 15 of the antenuptial agreement.

{¶44} On November 25, 2019, the trial court overruled Stephanie's objection to the magistrate's decision by concluding that "[a] survivorship deed * * * is not necessary to accomplish the purpose of the antenuptial agreement, as both parties are now living," and "it does not affect her proportionate share in the ownership interest of the property." (Doc. No. 184). The trial court further overruled Stephanie's objection to "the Magistrate's failure to address the other deficiencies in [Thomas's] failure to perform under the Antenuptial Agreement, including [his] failure to perform pursuant to section 15 of the agreement." (*Id.*). Specifically, the trial court found that Stephanie's "own testimony belies her objection" because she "testified that during the time of their marriage, [Thomas] covered all of [her] expenses." (*Id.*). Moreover, the trial court found that Stephanie's objection is belied by her testimony because "that payment of the expenses ceased in November 2017" and "a key aspect of Section 15 of the agreement is that it requires that [Thomas] pay [Stephanie's] expenses 'so long as they are residing together as husband and wife'" but there was no evidence in the record when they ceased residing as husband and wife. (*Id.*, quoting Mar. 27, 2019 Tr., Defendant's Ex. B).

{¶45} We agree with the trial court. Due to the nature of a survivorship deed and the plain and unambiguous language of the parties' antenuptial agreement,

common sense suggests that the parties did not intend for the provisions of a survivorship deed to remain in effect if the parties divorced. *Accord Johnson*, 2011-Ohio-500, at ¶ 28 ("Finally, due to the nature of the other Will provisions contained in the prenuptial agreement, common sense suggests that the parties did not intend for these requirements to remain in effect if the parties divorced."). Specifically, the parties' antenuptial agreement provides that in the event that the parties divorce, "[e]ach party shall retain as his or her own, free and clear of *any* claim by the other, any and all assets owned by him or her on the date of the parties' marriage * * * ." (Emphasis added.). (Mar. 27, 2019 Tr., Defendant's Ex. B). Among the assets owned by Thomas on the date of the parties' marriage (according to Exhibit A attached to the parties' antenuptial agreement), is Thomas's residence.

{¶46} Moreover, section 15 of the parties' antenuptial agreement provides, in its relevant part, that the parties "agree that as long as they are residing together as husband and wife, each will contribute to provide the reasonable living expenses for both parties based upon a standard of living which is in accordance with and appropriate to the income at that time, of both parties * * * ." (*Id.*). There is some competent evidence in the record supporting the trial court's conclusion that the parties complied with this provision. In particular, Stephanie testified at the March 27, 2019 hearing that Thomas provided her financial support. (Mar. 27, 2019 Tr. at 65, 74, 77-78). She further testified that she began paying for her own expenses in

November 2017. (*Id.* at 74, 77). There is no evidence in the record reflecting when the parties ceased residing together as husband and wife.

**{¶47}** Finally, Stephanie contends that she was denied "proper notice and opportunity to be heard on the issue of the validity of the [antenuptial] agreement at the time of the divorce" because the trial court denied her request for a continuance after "obtaining new counsel, not long before the hearing" and "improperly limited the amount of time each party had to present its case on the issue of the [antenuptial agreement] * * * ." (Appellant's Brief at 8). Stephanie failed to cite any authority in support of her claim. "[A]n appellate court may disregard an assignment of error pursuant to App.R. 12(A)(2): 'if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A).'" *Rodriguez v. Rodriguez*, 8th Dist. Cuyahoga No. 91412, 2009-Ohio-3456, ¶ 4, quoting App.R. 12(A); *Hawley v. Ritley*, 35 Ohio St.3d 157, 159 (1988).

**{¶48}** App.R. 16(A)(7) requires that Stephanie include in her brief: "An argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies. The argument may be preceded by a summary."

{¶49} "'It is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to any alleged error.'" *Rodriguez* at ¶ 7, quoting *State v. McGuire*, 12th Dist. Preble No. CA95-01-001, 1996 WL 174609, *14 (Apr. 15, 1996). "An appellate court is not a performing bear, required to dance to each and every tune played on an appeal." *Id.*, citing *State v. Watson*, 126 Ohio App.3d 316, 321 (12th Dist.1998) and *McGuire* at *14. Because Stephanie failed to cite any legal authority in support of her argument, we decline to review it.

{¶50} For these reasons, Stephanie's first assignment of error is overruled.

{¶51} Under her second assignment of error, Stephanie contends that the trial court abused its discretion by concluding that the parties' antenuptial agreement is enforceable and by failing to award her temporary- and permanent-spousal support. As an initial matter, to the extent that Stephanie contends that the trial court failed to award her temporary-spousal support, Stephanie's argument is specious. That is, the trial court awarded Stephanie temporary-spousal support in this case.

{¶52} Turning to Stephanie's argument that the trial court abused its discretion by enforcing the parties' antenuptial agreement by failing to award her permanent-spousal support, Stephanie contends that the trial court failed to consider whether the provision of the agreement regarding spousal support was unconscionable at the time of the divorce. "Even if a [antenuptial] agreement is

valid at the time of execution, a party may challenge the spousal support provisions contained therein by demonstrating that the terms related to spousal support are unconscionable at the time of the divorce." *Vanderbilt*, 2013-Ohio-1222, at ¶ 39, citing *Gross*, 11 Ohio St.3d at 109.

{¶53} Our review of a trial court's decision regarding the conscionability of a spousal-support provision of an antenuptial agreement "implicates a mixed question of law and fact." *Mann*, 2010-Ohio-1489, at ¶ 10.

> "A determination of whether a written contract is unconscionable is an issue of law which a court reviews de novo. When a trial court makes factual findings, however, supporting its determination that a contract is or is not unconscionable, such as any findings regarding the circumstances surrounding the making of the contract, those factual findings should be reviewed with great deference."

*Id.*, quoting *Saari*, 2009-Ohio-4940, at ¶ 11. "The analysis of whether spousal support provisions are unconscionable is guided by the factors applicable to the determination of support under R.C. 3105.18(C)(1)." *Vanderbilt* at ¶ 39. *See also Mann* at ¶ 10. Those factors include:

(a)   The income of the parties * * * ;

(b)   The relative earning abilities of the parties;

(c)   The ages and the physical, mental, and emotional conditions of the parties;

(d)   The retirement benefits of the parties;

(e)   The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party * * * ;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

R.C. 3105.18(C)(1). "Furthermore, * * * the party challenging the conscionability of a spousal support provision 'has the burden of showing the unconscionable effect of the provision at the time of [the] divorce[.]'" *Saari* at ¶ 12, quoting *Gross* at 109.

{¶54} In the June 5, 2020 decision, the trial court's magistrate (after reviewing "the factors of R.C. 3105.18(C) and other relevant factors") concluded

that "the provisions of the Antenuptial Agreement have not lost their validity by reason of changed circumstances and that the provisions are not unconscionable." (Doc. No. 229). The trial court's magistrate found the following factors under R.C. 3105.18(C)(1): R.C. 3105.18(C)(1)(a): Thomas has significant income, while Stephanie "has no independent income"; R.C. 3105.18(C)(1)(b): Thomas "has the ability to maintain current income for some time, and then has the ability to maintain passive income from income producing assets"; R.C. 3105.18(C)(1)(c): Stephanie "is fifty[-]eight years old and asserts disabling health issues" but "presented no medical testimony, and no evidence of substantive diagnosis" and her testimony was not "independently credible," while Thomas is "sixty[-]nine years old, and has had health issues" but "maintains an active lifestyle"; R.C. 3105.18(C)(1)(d): Thomas "has a retirement account through Edward Jones," while "[o]ther than Social Security eligibility, [Stephanie] has no known retirement benefits"; R.C. 3105.18(C)(1)(e): "[t]he parties were marred fifteen years prior to separation"; R.C. 3105.18(C)(1)(f): "[t]here are no children of the marriage"; R.C. 3105.18(C)(1)(g): "[t]he parties have a nice home and maintained a modest lifestyle during the marriage"; R.C. 3105.18(C)(1)(h): "Thomas graduated high school and had two years of college prior to marriage," while "Stephanie is a high school graduate with some secondary education," including "an aesthetician license" and "real estate license"; R.C. 3105.18(C)(1)(i): Thomas "has significant real estate and other

-28-

business assets" and Stephanie "will have access to funds from one-half of the house equity and a portion of a Stanford 104 Ltd. asset," she received proceeds "from the sale of her deceased father's farm equipment," and proceeds "from her mother's estate," which, although not credible, she testified "she had already spent"; R.C. 3105.18(C)(1)(j): neither contributed to the education or training of the other; R.C. 3105.18(C)(1)(k): Stephanie "did not indicate any intention to seek training or employment" and her "history does not reflect that [she] will seek productive training or employment"; R.C. 3105.18(C)(1)(l): "[t]he parties submitted no evidence of the tax consequences of an award of spousal support"; and R.C. 3105.18(C)(1)(m): "[t]here is no evidence that [Stephanie's] lack of employment was due to marital responsibilities." (*Id.*).

{¶55} In its February 5, 2021 decision overruling Stephanie's objections to the magistrate's decision, the trial court ("[a]fter an independent review of the record") likewise concluded that the provision in the parties' antenuptial agreement regarding spousal support was not unconscionable at the time of the parties' divorce.

{¶56} Based on our review of the record, we agree that the provision of the parties' antenuptial agreement regarding spousal support is valid and enforceable—that is, it is not unconscionable. The trial court's (and the trial court's magistrate's) factual findings supporting its determination that the parties' antenuptial agreement is not unconscionable are supported by the record.

**{¶57}** Although Stephanie takes significant issue with the disparity in income between the parties, the record "evidences that the disparity in net worth and annual income pre-dated the parties' marriage, which is typically the reason why parties contract to avoid an equitable distribution of assets should their marriage end in divorce." *Saari*, 2009-Ohio-4940, at ¶ 15, citing *Millstein*, 2002-Ohio-4783, at ¶ 87 and *Fletcher*, 68 Ohio St.3d at 467. Moreover, Stephanie alleges that the parties' agreement was unconscionable at the time of the divorce because she presented evidence "that she is currently incapable of working due to her current health for issues that arose after the parties entered into the Antenuptial Agreement." (Appellant's Brief at 13). However, notwithstanding that evidence and Stephanie's testimony, the trial court's magistrate did not find Stephanie's allegation be credible. *Gates*, 2007-Ohio-5040, at ¶ 43.

**{¶58}** Furthermore, there was no evidence presented that Stephanie incurred any additional burdens for the care of any children or had a marked change in her standard of living or cost of necessary maintenance expenses to constitute a "significant change in circumstances between the time she signed the [antenuptial] agreement, which the [trial] court found to be valid, and the time [of the] divorce." *Saari* at ¶ 14. In sum, the record in this case does not reflect the circumstances necessary to conclude that the parties' agreement was unconscionable at the time of the divorce. *See id.* at ¶ 15 ("The record in this case does not reflect facts or

circumstances remotely similar to those which led to a finding of unconscionability in *Gross*."). Thus, the trial court did not err by concluding that the parties' antenuptial agreement was not unconscionable or by denying Stephanie's request for permanent spousal support. Accordingly, the trial court did not abuse its discretion by enforcing the parties' antenuptial agreement.

**{¶59}** Consequently, Stephanie's second assignment of error is overruled.

**Assignment of Error No. III**

**The Trial Court Abused Its Discretion and Committed Reversible Error When It Failed to Properly Divide Marital Property.**

**{¶60}** In her third assignment of error, Stephanie argues that the trial court erred in its determination of marital and separate assets and its distribution and valuation of those assets.

*Standard of Review*

**{¶61}** "This court reviews the trial court's classification of property as marital or separate under a manifest-weight-of-the-evidence standard." *Lotz v. Lotz*, 3d Dist. Auglaize No. 2-14-06, 2014-Ohio-5625, ¶ 16. "Accordingly, we will not reverse the trial court's judgment if it is supported by some competent, credible evidence." *Id.* "'"This highly deferential standard of review permits the affirmation of the trial court's judgment if there is even 'some' evidence to support the court's finding."'" *Id.*, quoting *Reed v. Reed*, 3d Dist. Allen No. 1-09-63, 2010-Ohio-4550,

-31-

¶ 7, quoting *Huelskamp v. Huelskamp*, 185 Ohio App.3d 611, 2009-Ohio-6864, ¶ 15 (3d Dist.).

**{¶62}** "Once the characterization has been made, 'the court should normally award each spouse his or her separate property and then distribute the marital estate equally unless an equal division would be inequitable.'" *Tretola v. Tretola*, 3d Dist. Logan No. 8-14-12, 2014-Ohio-5484, ¶ 47, quoting *Barkley v. Barkley*, 119 Ohio App.3d 155, 159 (4th Dist.1997), citing R.C. 3105.171(C), (D). *See also* R.C. 3105.171(B). "Trial courts have 'broad discretion to determine what property division is equitable in a divorce proceeding.'" *Id.*, quoting *Cherry v. Cherry*, 66 Ohio St.2d 348 (1981), paragraph two of the syllabus. "A trial court's decision allocating marital property will not be reversed absent an abuse of discretion." *Id.*, quoting *Jackson v. Jackson*, 3d Dist. Paulding No. 11-07-11, 2008-Ohio-1482, ¶ 15, citing *Holcomb v. Holcomb*, 44 Ohio St.3d 128 (1989). As we previously stated, an abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

*Analysis*

**{¶63}** "In a divorce proceeding, the division of marital and separate property involves a two-step process governed by R.C. 3105.171." *Lotz* at ¶ 11. "First, the trial court must determine whether property is marital or separate property, and,

second, the trial court must equitably allocate the marital and separate property."
*Id.* *See also* R.C. 3105.171(B), (D).

{¶64} "Marital property generally includes all property acquired by either party during the marriage as well as the appreciation of separate property due to the labor, monetary, or in-kind contributions of either party during the marriage." *Avent v. Avent*, 166 Ohio App.3d 104, 2006-Ohio-1861, ¶ 15 (6th Dist.), citing R.C. 3105.171(A)(3)(a)(i) and (iii). *See also Welly v. Welly*, 3d Dist. Seneca No. 13-15-15, 2015-Ohio-4804, ¶ 32. "Marital property is to be divided equally in general, and each spouse is considered to have contributed equally to the acquisition of marital property." *Avent* at ¶ 15, citing R.C. 3105.171(C)(1) and (2).

{¶65} "However, marital property does not include separate property." *Id.*, citing R.C. 3105.171(A)(3)(b). "Under R.C. 3105.171(A)(6)(a)(v), separate property includes any real or personal property that is excluded by a valid antenuptial agreement." *Id.* "'Thus, Ohio law specifically allows for property that would normally be considered marital to be excluded from a division of marital property by a valid antenuptial agreement.'" *Id.*, quoting *Todd v. Todd*, 10th Dist. Franklin No. 99AP-659, 2000 WL 552311, *5 (May 4, 2000).

{¶66} "An antenuptial agreement is a contract entered into between a man and a woman in contemplation, and in consideration, of their future marriage whereby the property rights and economic interests of either the prospective wife or

husband are determined and set forth in a written instrument." *Id.* at ¶ 16, citing *Gross*, 11 Ohio St.3d at 102. As we previously stated, "[t]he interpretation of a contract that is clear and unambiguous is a question of law," which we review de novo. *Id.*

**{¶67}** "The party seeking to establish that property is separate rather than marital bears the burden of proof, by a preponderance of the evidence, to trace the asset to separate property." *Tretola*, 2014-Ohio-5484, at ¶ 45, citing *Schalk v. Schalk*, 3d Dist. Seneca No. 13-07-13, 2008-Ohio-829, ¶ 6. *See also Golick v. Golick*, 12th Dist. Clermont Nos. CA99-05-040 and CA99-05-045, 2001 WL 1598290, *9 (Dec. 17, 2001) ("Because [husband-appellant] sought to have the appreciation of the * * * properties characterized as separate property, he had the burden of proof on this issue by a preponderance of the evidence."), citing *Peck v. Peck*, 96 Ohio App.3d 731, 734 (12th Dist.1994).

**{¶68}** As we determined in Stephanie's first and second assignments of error, the parties' antenuptial agreement is valid and enforceable. *See generally Burdick v. Burdick*, 11th Dist. Ashtabula No. 2013-A-0030, 2014-Ohio-2876, ¶ 16. The parties' antenuptial agreement describes the distribution of the of the parties' assets, and provides, in relevant part:

> 6. Stephanie R. Lauth covenants and agrees that all property now owned by or for the benefit of Thomas M. Heimann, of whatsoever nature and wheresoever located, and all dividends, interests, rents, issues and profits thereof, shall be and remain his sole and separate

property, to use and dispose of as he sees fit as if no marriage had been entered into between the parties.

7.    Stephanie R. Lauth agrees that any future increase in value of the separate property now owned by or for the benefit of Thomas M. Heimann, as well as any appreciation in value thereof, and in particular those assets and expectancies disclosed and described in Exhibit A to this Agreement, and all dividends, interests, rents, issues and profits thereof, shall be and remain his sole and separate property, to use and dispose of as he sees fit as if no marriage had been entered into between the parties.

* * *

17.    In the event that the parties' marriage is dissolved or terminated by means of a decree or judgment entry entered by a Court of competent jurisdiction after the date upon which the parties are married * * *, then the following provisions shall apply:

A.    Each party shall retain as his or her own, free and clear of any claim by the other, any and all assets owned by him or her on the date of the parties' marriage as well as any increase in value of any separate asset from the date of the parties' marriage;

* * *

D.  Except as hereinafter provided, the parties will divide equally any joint assets, if any, which they may have accumulated during the course of their marriage.

* * *

19.  * * * The household goods which each party brings to the marriage are his/her own separate property.  After the marriage of Thomas M. Heimann and Stephanie R. Lauth, if and when household items are bought by either party or jointly for use in the marital residence, such purchased household items are/become a marital asset.

(Plaintiff's Ex. 10).

-35-

{¶69} Interpreting the parties' agreement, the trial court's magistrate determined in the June 5, 2020 entry that the following assets (as relevant to Stephanie's argument on appeal) are separate property and remain Thomas's assets: (1) "Tom Heimann Enterprises, Inc. is the same entity as Advanced Novelty Inc. as disclosed in the agreement and the funds from the sale and repurchase of the business trace directly through an account and trust disclosed in the agreement"; (2) "[s]ince the marriage, [Thomas] added mini storage buildings and operates Flag City Mini Storage through Stanford 101, Ltd." and because "Flag City Mini Storage is an appreciation in the value of Stanford 101," "the appreciation remains [Thomas's] asset"; (3) "Stanford 104 Ltd. is purchasing real estate * * * through land contract" and the "[i]nitial payment was made from the Flag City Mini Storage account"; (4) "Arrowhead Pointe LLC * * * purchased real estate * * * with a * * * withdrawal from the Edward Jones account," which is "addressed in the agreement and contained the remaining funds from the 2007 sale of Advanced Novelty"; (5) Thomas "had an Edward Jones retirement fund held by Thomas M. Heimann, Trustee of Thomas M. Heimann Revocable Trust" and "still has this account"; (6) Thomas "had an Edward Jones retirement account held in his individual name" and "still has this account"; (7) Thomas "had a Boston Capital Fund account" and "tax returns reflect the existence of a Boston Capital Fund account"; and (8) even though "the parties disclosed that they had tangible personal property" in the antenuptial

agreement," Thomas "did not submit a complete list of his premarital tangible personal property" and Stephanie "did not submit a list of premarital tangible personal property." (Doc. No. 229).

{¶70} Nevertheless, regarding the parties' personal property, the trial court's magistrate further found that Stephanie

> has possession of personal property that she owned at the time of marriage [and] also has some premarital personal property at the residence; including a washer and a dryer * * *, some clothing, a roll top desk, and a table and chairs, shelves, a chair, and a lamp in the basement. [Thomas] has put some items of [Stephanie's] premarital personal property in a storage unit. Pursuant to the Antenuptial Agreement, these items remain [Stephanie's] assets.
>
> * * *
>
> Marital Property:
>
> * * *
>
> [Thomas's] Exhibit 6 is a partial list of personal property acquired after marriage. [Stephanie] still has some clothing at the residence. [Thomas] has put some items in storage for [Stephanie]. Marital property identified in appraisal pictures includes the living room furniture, dining room furniture, kitchen appliances, massage room furniture, a television in the office, a couch in the sunroom, furniture in the first bedroom, and items in the outbuilding. During the pendency of the case, each party had times of exclusive possession of the house, and each had opportunity to inventory personal property acquired during the marriage. Without an appraisal of the property, precise valuation of the property, and an equal division of the value of the property, are [sic] not possible.

(*Id.*). Therefore, the trial court's magistrate determined that Stephanie should (1) "retain the marital personal property currently in her physical possession" (2)

"receive the items of marital personal property placed in storage"; (3) "receive any of her clothing that is still at the residence"; and (4) "receive the living room furniture, massage room furniture, the television in the office, the couch in the sunroom, and the furniture in the first bedroom." (*Id.*). The trial court's magistrate determined that Thomas should retain (1) "the items listed in Plaintiff's Exhibit 6, being the washer, dryer, refrigerator, mower, tiller, garden tools, dining room furniture, 50" television with stand, and the black leather love seat"; (2) "the guns, the giraffe, and the items in the outbuilding"; and (3) "any other marital personal property located at the residence." (*Id.*).

{¶71} In its February 5, 2021 decision addressing Stephanie's objections to the magistrate's decision, the trial court (as relevant to Stephanie's arguments on appeal) overruled Stephanie's objections to the magistrate's division of the parties' real property, retirement accounts, depository accounts, and personal property. As to Stephanie's objection regarding the parties' real property, the trial court concluded, "[a]fter a full and independent consideration of the parties' various objections to real estate division, the contact [sic] tracing that was or was not possible, and the legal status of the properties, * * * that the Magistrate's analysis demonstrates a complete and accurate analysis of how these properties should be divided." (Doc. No. 248). Similarly, the trial court overruled Stephanie's objection to the magistrate's decision concerning the division of the parties' retirement

accounts after concluding that her argument "that the assets are not properly traceable is without merit" since it was undisputed that Thomas "was the primary and nearly sole earner of income during the course of their marriage when she argued for spousal support and temporary spousal support." (*Id.*).

{¶72} The trial court concluded that Stephanie's objection to the magistrate's decision regarding the division of the parties' personal property amounted to a "compliance issue" rather than a compliant over the items that she was designated. (*Id.*). Furthermore, regarding Stephanie's depository-accounts objection, the trial court concluded that a First Federal checking account (which was not addressed in the magistrate's decision) is separate property based on Thomas's testimony "that the account existed before the marriage" even though "it was not specifically listed as part of the Antenuptial Agreement." (*Id.*).

{¶73} In this case, Stephanie raises several instances in which she contends that the trial court's characterization of Thomas's property as separate and subject to the antenuptial agreement is against the manifest weight of the evidence. Specifically, Stephanie argues that the trial court erred by concluding that Thomas met his burden of proving that the $502,500.00 of the "$567,485.00 deposited into his Edward Jones account" in March 2007 is from the sale of his Advance Novelty Business and, therefore, separate property. (Appellant's Brief at 20). Second, Stephanie argues that the trial court erred by determining that storage units that

Thomas constructed on property (during the marriage) owned by Stanford 101 Ltd. (which is separate property) were *also* separate property. Third, Stephanie contends the real property acquired by Stanford 104 Ltd. should be considered separate property since a "vast majority of the purchase, if not the entire purchase, was made by [sic] during the course of the marriage * * * ." (*Id.* at 23). Next, Stephanie contends that the property owned by Arrowhead Pointe LLC should be characterized as separate property because Thomas failed to meet his burden of proving that the funds used to acquire the property "are traceable to the accounts listed in the Antenuptial Agreement * * * ." (*Id.*).

{¶74} Stephanie further argues that the trial court erred by concluding that Thomas's retirement accounts are separate property because he "failed to establish that these accounts are premarital and separate * * *." (*Id.*). Likewise, Stephanie contends that the trial court erred by concluding that Thomas's First Federal checking account is separate property notwithstanding his failure to include it in the antenuptial agreement. In sum, Stephanie argues that the trial court erred by determining that Thomas's business interests are separate property.

{¶75} Finally, Stephanie contends that the trial court abused its discretion in its allocation of the parties' personal property. Specifically, Stephanie argues that the trial court "failed to divided [the parties' personal] property mentioned at trial"

and "failed to permit [her] to reenter the home to accurately itemize the property." (Appellant's Brief at 26).

{¶76} Stephanie's arguments are without merit. Rather, we agree the trial court's division of property is required by the clear and unambiguous language of the parties' antenuptial agreement. *See Todd*, 2000 WL 552311, at *5. Indeed, there is some competent, credible evidence supporting the trial court's classification of the parties' marital and separate property.

{¶77} At trial, Thomas testified that he sold Advanced Novelty in March 2007 for $502,500.00 and deposited the funds into his Edward Jones account (held by the trust). (Dec. 9, 2019 Tr. at 51-52). (*See also* Feb. 20, 2020 Tr. at 41). Thomas testified that he formed a new corporation, Tom Heimann Enterprises, Inc., "when [he re-]purchased the assets of Advanced Novelty, Inc. * * * " in 2008. (Dec. 9, 2019 Tr. at 53, 55). (*See also* Plaintiff's Exs. 7, 7A). Thomas identified Plaintiff's Exhibit 7B as statements from his Edward Jones account (held by the trust)— namely, statements from March 2007 reflecting a "current value of 1 million 85,000" with a $567,000.00 deposit. (Dec. 9, 2019 Tr. at 56-57); (Plaintiff's Ex. 7B). According to Thomas, "[m]ost of [the deposit] came from the sale of the business" and the remaining portion "could have been profit made on the balance of the account." (Dec. 9, 2019 Tr. at 57-58). Moreover, Thomas testified that Plaintiff's Exhibit 7C reflects a withdrawal of $37,500.00 in October 2008 from

when he re-purchased Advanced Novelty. (*Id.* 58-59); (Plaintiff's Ex. 7C). Thomas testified that he has two accounts with Edward Jones and that one of those accounts is held by a trust. (Dec. 9, 2019 Tr. at 48-49). (*See also* Feb. 20, 2020 Tr. at 40-41).

{¶78} Next, Thomas testified that Stanford 101 Ltd.—which was formed prior to the marriage—owns several parcels of real property which were purchased prior to the marriage. (Dec. 9, 2019 Tr. at 59-69); (Feb. 20, 2020 Tr. at 43) (Plaintiff's Exs. 8, 8A1, 8A2, 8A3, 8A4). Likewise, Thomas testified that *no* marital funds were used to fund the real property owned by Stanford 104 Ltd.—a business that was formed in 2004. (Dec. 9, 2019 Tr. at 87-88, 90); (Plaintiff's Exs. 11B, 11C). Specifically, Thomas testified Stanford 104 Ltd. entered a land contract (after the complaint for divorce was filed) to acquire real property using funds from the Flag City Mini Storage business account. (Dec. 9, 2019 Tr. at 91-93, 152). Thomas testified that Stanford 101 Ltd. and Stanford 104 Ltd. "own the property" on which Flag City Mini Storage is situated. (*Id.* at 98-99).

{¶79} Moreover, Thomas testified that the funds used to purchase the real property owned by Arrowhead Pointe LLC (a business formed in 2017) "came from some money that was in [the] trust at Edward Jones." (*Id.* at 47) (*See also id.* at 947-97); (Feb. 20, 2020 Tr. at 41); (Plaintiff's Ex. 18B). Further, Thomas testified that he has a First Federal checking account that was opened prior to the marriage

but that it was omitted from the antenuptial agreement. (Dec. 9, 2019 Tr. at 35, 112).

{¶80} Therefore, there is some competent, credible evidence supporting the trial court's characterization of the foregoing property as Thomas's separate property under the parties' antenuptial agreement.

{¶81} Turning to the parties' personal property, Thomas identified Plaintiff's Exhibit 5 as a list of pre-marital items that he requested that the trial court award to him and Plaintiff's Exhibit 6 as "a list of postmarital items that [he would] like to have kept in the house." (*Id.* at 110-112). Furthermore, Thomas identified Plaintiff's Exhibit 4 as an appraisal of the marital residence. (*Id.* at 154). He identified pre-marital and post-marital personal property depicted in photographs of the interior of the residence that are attached to Plaintiff's Exhibit 4. (*See id.* at 155-161); (Plaintiff's Ex. 4). Notwithstanding her argument regarding their personal property, Stephanie testified at trial that she did not prepare an account of pre- or post-marital items at the time of trial. (Feb. 20, 2020 Tr. at 126).

{¶82} Contrary to Stephanie's argument that the trial court did not "divide all of this property mentioned at trial," the trial court allocated the parties' personal property that the parties submitted to the trial court for division. Importantly, Stephanie did not provide the trial court with an inventory of any separate or marital personal property that she desired the trial court to allocate to her. Furthermore, any

contention that she was denied the opportunity to "reenter the home to accurately itemize the property" is disingenuous. The record supports that Stephanie had ample opportunity to inventory the property she desired to claim during the time she had possession of the marital residence. Therefore, based on the scant evidence that the parties presented to the trial court, there is some competent, credible evidence supporting the trial court's classification of the parties' personal property. Consequently, we cannot conclude that the trial court abused its discretion in its allocation of the parties' marital property.

{¶83} Accordingly, Stephanie's third assignment of error is overruled.

### Assignment of Error No. IV

**The Trial Court Abused Its Discretion and Committed Reversible Error When it Failed to Hold Appellee in Contempt.**

{¶84} In her fourth assignment of error, Stephanie argues that the trial court abused its discretion by failing to find Thomas in contempt of court for violating its temporary orders to pay Stephanie's phone and medical bills. Stephanie further argues that the trial court abused its discretion by ordering Thomas to pay only $250.00 in attorney fees as a sanction for violating the mutual restraining order by loaning $250,000.00 to his son.

*Standard of Review*

{¶85} This court will not reverse a finding of contempt absent an abuse of discretion by the trial court. *State ex rel. Ventrone v. Birkel*, 65 Ohio St.2d 10, 11

(1981). Similarly, an appellate court reviews the punishment imposed for contempt under an abuse-of-discretion standard. *Wilson v. Jones*, 3d Dist. Seneca No. 13-13-06, 2013-Ohio-4368, ¶ 32, citing *Whitman v. Whitman*, 3d Dist. Hancock No. 5-11-20, 2012-Ohio-405, ¶ 52. Once again, an abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

*Analysis*

{¶86} A trial court has inherent authority to enforce its prior orders through contempt. *Dozer v. Dozer*, 88 Ohio App.3d 296, 302 (4th Dist.1993). *See also* R.C. 2705.02(A). "Under Ohio law, contempt of court consists of two elements." *Cichanowicz v. Cichanowicz*, 3d Dist. Crawford No. 3-13-05, 2013-Ohio-5657, ¶ 88. The first element is the finding of contempt and the second element is the imposition of a penalty or sanction. *Id.*

{¶87} "A finding of civil contempt requires clear and convincing evidence that the alleged contemnor has failed to comply with the court's prior orders." *Moraine v. Steger Motors, Inc.*, 111 Ohio App.3d 265, 268 (2d Dist.1996), citing *ConTex, Inc. v. Consolidated Technologies, Inc.*, 40 Ohio App.3d 94, 95 (1st Dist.1988). "'Clear and convincing evidence' has been defined as 'that measure or degree of proof which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal

cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Ohio State Bar Assn. v. Reid*, 85 Ohio St.3d 327, 331 (1999), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "It is not necessary to show willful disobedience for a finding of contempt in cases where it is alleged that a court order was violated." *Kaufman v. Kaufman*, 3d Dist. Auglaize No. 2-05-24, 2006-Ohio-603, ¶ 15.

{¶88} "Factual findings underpinning the trial court's contempt judgment will not be reversed if they are supported by some competent, credible evidence." *Wilson*, 2013-Ohio-4368, at ¶ 12, citing *Sec. Pacific Natl. Bank. v. Roulette*, 24 Ohio St.3d 17, 20 (1986) and *Kerchenfaut v. Kerchenfaut*, 3d Dist. Allen No. 1-03-49, 2004-Ohio-810, ¶ 13. "The trial court is in the best position to judge the credibility of testimony because it is in the best position to observe the witness' gestures and voice inflections." *Id.*, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984) and *Johnson v. Johnson*, 71 Ohio App.3d 713, 718 (11th Dist.1991).

{¶89} In the June 5, 2020 decision, the trial court's magistrate found Thomas in contempt for violating the mutual restraining order by lending his son $250,000.00, but further concluded that Stephanie failed to present clear and convincing evidence that Thomas violated the temporary orders—namely, that Thomas failed to pay her phone and medical bills. (*See* Doc. No. 229). Even though the trial court's magistrate found Thomas in contempt for violating the terms of the

mutual restraining order by loaning his son $250,000.00, the trial court's magistrate found that Thomas purged the contempt because the loan had been repaid. As a consequence of violating the mutual restraining order, the trial court's magistrate ordered Thomas to pay Stephanie $250.00 in attorney fees.

{¶90} In its February 5, 2021 decision addressing her objections to the magistrate's decision, the trial court overruled Stephanie's objections to the magistrate's disposition of her June 27 and September 9, 2019 contempt motions. Specifically, the trial court agreed with the magistrate, after an independent review of the record and the magistrate's recommendations, that Thomas violated mutual restraining order by loaning $250,000.00 to his son and "that insufficient proof was presented by [Stephanie] to prove, by clear and convincing evidence, that contempt had occurred." (Doc. No. 248).

{¶91} The trial court did not abuse its discretion by finding that Thomas did not disobey a prior order of the court because Stephanie did not present clear and convincing evidence that Thomas violated the trial court's temporary orders to pay Stephanie's phone and medical bills. In concluding that Stephanie failed to present clear and convincing evidence that Thomas violated the trial court's temporary orders by failing to pay her phone and medical bills, the trial court's magistrate found that Stephanie did not present any evidence that she requested payment or presented the billing information necessary to Thomas to make such payments.

Specifically, the trial court's magistrate found that Thomas "made one payment to cover three months of [Stephanie's] phone bill," but has not made a payment since because Stephanie changed phone plans and did not "present[] phone bills to [Thomas]." (Doc. No. 229). Likewise, the trial court's magistrate found that [t]here is no evidence that [Stephanie] presented [medical] bills to [Thomas] for payment." (*Id.*).

{¶92} There is some competent, credible evidence in the record supporting the trial court's findings. Indeed, Stephanie did not present any evidence documenting her phone or medical expenses at trial, and there is no evidence of those expenses in the record. Rather, Stephanie identified Defendant's Exhibit WW as a copy of a check for $105.00 from Thomas as "payment to [her] for the phone for * * * three months." (Feb. 20, 2020 Tr. at 102). (*See also id.* at 108); (Defendant's Ex. WW). Furthermore, Thomas testified that he could not recall the last time that Stephanie provided him with a medical bill. (Feb. 20, 2020 Tr. at 38). Even though, Thomas suggested through his testimony that "they're probably in a pile of mail at home," he clarified that the unopened mail is explanation-of-benefit letters from the insurance company. (*Id.* at 38 45-46). Therefore, we conclude that the trial court did not abuse its discretion by concluding that Thomas did not violate its temporary orders by failing to pay Stephanie's phone and medical bills.

{¶93} Moreover, the trial court did not abuse its discretion by ordering Thomas to pay Stephanie $250.00 in attorney fees. "A trial court may, within its discretion, include attorney fees as part of the costs taxable to a defendant found guilty of civil contempt." *Streidl v. Streidl*, 2d Dist. Montgomery No. 27165, 2017-Ohio-403, ¶ 40, quoting *Planned Parenthood Assn. of Cincinnati, Inc. v. Project Jericho*, 52 Ohio St.3d 56, 67 (1990). Because an attorney-fee award in a domestic-relations action is committed to the sound discretion of the trial court, we review the attorney-fee award for an abuse of discretion. *See Cichanowicz*, 2013-Ohio-5657, at ¶ 92; *Hoagland v. Hoagland*, 2d Dist. Miami No. 2014-CA-30, 2015-Ohio-2426, ¶ 18. Thus, for this court to reverse a trial court's attorney-fee award, we must conclude that the award is unreasonable, arbitrary, or unconscionable. *See Flowers v. Flowers*, 10th Dist. Franklin No. 10AP1176, 2011-Ohio-5972, ¶ 21, citing *Blakemore*, 5 Ohio St.3d at 219.

{¶94} Based on our review of the record, we cannot conclude that the trial court's attorney-fee award is unreasonable, arbitrary, or unconscionable. *See Hoagland* at ¶ 19. Importantly, Stephanie did not request attorney fees in her June 27, 2019 contempt motion or present any evidence that attorney fees were at issue at trial. *See id.* at ¶ 20. Thus, while Stephanie might not be completely satisfied with the way in which she was compensated, the trial court did not abuse its

discretion by awarding Stephanie $250.00 in attorney fees. *See Schiesswohl v. Schiesswohl*, 9th Dist. Summit No. 21629, 2004-Ohio-1615, ¶ 14.

**{¶95}** Stephanie's fourth assignment of error is overruled.

**{¶96}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW and WILLAMOWSKI, J.J., concur.**

**/jlr**