DECISION. *Page 2 
{¶ 1} Defendant-appellant Gerald Schmitt appeals from the divorce decree terminating his marriage to plaintiff-appellee Maria Azarova. Prior to entering the decree, the trial court had invalidated a prenuptial agreement between the parties. In the decree, the court ordered an equitable distribution of marital property. Schmitt now challenges the court's invalidation of the prenuptial agreement.
 {¶ 2} Azarova, a native of the Ukraine, was a "mail-order bride." Schmitt, a native of the United States, first wrote to Azarova in 1995. The parties met in 1996, when Schmitt traveled to the Ukraine. Azarova came to the United States in August 1997 on a three-month fiancée visa. Under this visa, Azarova had 90 days to marry Schmitt. If she married within this time, she could stay in this country. If she did not marry within this time, she would have to leave.
 {¶ 3} The parties were married on November 9, 1997, a week before the expiration of Azarova's visa. Azarova was 22 years old and had never been married. Schmitt was 38 years old and had been married and divorced once before.
 {¶ 4} Five days prior to the wedding, the parties had entered into a prenuptial agreement. Schmitt had retained the services of an attorney to draft the agreement. According to Schmitt and his attorney, the parties had met with the attorney on one prior occasion to discuss the agreement. In total, the parties met with Schmitt's attorney for three to four hours.
 {¶ 5} The eight-page prenuptial agreement drafted for Schmitt contained the typical legalese used in these agreements. Schmitt attached to the agreement an exhibit that listed his assets and their approximate values. Included on this list were *Page 3 
two houses, an "IRA" account, a checking account, a "TSP Retirement" account, and "stocks." The agreement stated that Azarova did not have any assets to disclose.
 {¶ 6} Both Schmitt and his attorney admitted that Azarova was unrepresented when she signed the agreement, but they claimed that she had been informed that she could retain her own attorney. Schmitt testified that he had opened a bank account for Azarova, but he could not recall the amount of money he had put into the account before the marriage.
 {¶ 7} Schmitt's attorney testified that he had explained to Azarova that what Schmitt owned on that day would not be hers in the event of divorce, and that she was waiving her right to any appreciation in those assets. He claimed that he had further explained to her the difference between premarital and marital property, but he admitted that he had not explained to Azarova the difference between the passive appreciation of premarital property and the active appreciation of premarital property, the latter being exemplified by a contribution of marital funds.
 {¶ 8} Schmitt's attorney allowed Azarova to read the agreement with the use of an English-to-Russian dictionary, and he offered to answer any questions she had about the agreement. Azarova asked about the immigration implications of the agreement.
 {¶ 9} Both Schmitt and his attorney claimed that Azarova was fairly fluent in the English language. Additionally, they claimed that she was not upset when she signed the agreement.
 {¶ 10} Azarova testified that she had neither the money to pay an attorney nor the necessary information to locate one. She claimed that she was not fluent in English, that she did not understand the agreement, that no one explained to her the *Page 4 
difference between premarital and marital property, and that she had only met with Schmitt's attorney once. She further claimed that she knew Schmitt would not marry her unless she signed the agreement and that she had cried in the attorney's office due to stress over the agreement.
 {¶ 11} Under the terms of the agreement, Azarova waived and released all rights she had in Schmitt's property by virtue of her marriage to him, including the appreciation of premarital assets through marital funds. Schmitt created an exception for the house that the parties were to reside in, which had belonged to Schmitt's grandparents. He provided Azarova with a life estate in that property if he were to predecease her during the marriage. He also purported to provide her with some amount of equity in the residence if they were to divorce, but the paragraph defining the amount was missing from the agreement. This undefined equity provision conflicted with another provision in the agreement that stated that, in the event of a divorce, Azarova would only be entitled to $5000 plus the cost of an airplane ticket back to the Ukraine.
 {¶ 12} After Azarova had filed for divorce in 2004, Schmitt moved to enforce the parties' prenuptial agreement. A magistrate held an evidentiary hearing on the motion and ruled that the agreement was enforceable. Azarova filed objections to the magistrate's decision. After reviewing the evidence, the trial court sustained the objections and held that the agreement was unenforceable. Schmitt requested findings of fact and conclusions of law. The trial court ordered the parties to submit proposed findings of fact and conclusions of law, and it subsequently adopted those proposed by Azarova. The court then ordered an equitable distribution of the marital property in the divorce decree. *Page 5 
 {¶ 13} In his first assignment of error, Schmitt argues that the trial court erred by invalidating the prenuptial agreement. The essence of his claim is that the trial court could not have invalidated the agreement in the face of his own evidence that it was valid.
 {¶ 14} The Ohio Supreme Court has upheld the enforcement of prenuptial agreements disposing of property in the event of a divorce where three basic conditions are met.[1] These three conditions, enumerated inGross v. Gross, are that (1) the parties entered into the agreement freely, without fraud, duress, coercion, or overreaching; (2) the parties entered into the agreement after full disclosure of the nature, value, and extent of the proponent spouse's property; and (3) the parties did not use terms to promote or encourage divorce or profiteering by divorce.[2]
 {¶ 15} A prenuptial agreement is a contract.[3] The challenging party ordinarily has the initial burden of establishing grounds for invalidating the agreement in accordance with contract law.[4] But when a prenuptial agreement provides disproportionately less than the party challenging it would have received in an equitable distribution, the proponent of the agreement must show "that the other party entered into it with the benefit of full knowledge or disclosure of the assets of the proponent."[5] This burden shift recognizes the fiduciary relationship created when parties agree to marry and the fact that a prenuptial agreement negates the statutorily defined and presumptive right of a spouse to an equitable distribution of marital assets upon divorce.[6] *Page 6 
 {¶ 16} The focus of the full-disclosure inquiry is whether a spouse has concealed assets. The condition of full disclosure can be satisfied by attaching an asset list with accurate valuations to the prenuptial agreement or by showing that there has been a full disclosure by other means.[7]
 {¶ 17} In this case, the trial court held that the prenuptial agreement failed the first two prongs of the Gross test. As to the first prong, the court found evidence of fraud, duress, coercion, and overreaching in the consummation of the agreement. Thus, the court concluded that the parties had not entered into the agreement "freely." As to the second prong, the court ruled that Schmitt had the burden of proof on this issue because the agreement would have provided Azarova with much less than her equitable share of the marital property. The court found deficiencies in Schmitt's asset disclosure and in Azarova's knowledge of Schmitt's assets. The court concluded that Schmitt had not met his burden of showing that Azarova entered into the agreement after a full disclosure of the nature, value, and extent of his assets.
 {¶ 18} In reviewing the trial court's determination concerning the validity of a prenuptial agreement, an appellate court should uphold the trial court's findings if they are supported by competent evidence.[8]
In this case, the trial court held that the prenuptial agreement failed the enforceability test on several grounds, any one of which, if supported by the evidence, would have negated the validity of the agreement. We first review whether Schmitt met his burden to show that Azarova had entered into the agreement with full knowledge of his assets or after Schmitt's full disclosure of his assets. *Page 7 
 {¶ 19} Schmitt claimed that he had fully disclosed his assets in a document that was attached to the prenuptial agreement. Included on this list were two houses, an "IRA" account, a checking account, a "TSP Retirement" account, and stocks, which were all given an estimated value. Schmitt admitted that the values on the real estate were not accurate because they did not include encumbrances.
 {¶ 20} In finding that Schmitt had not fully disclosed his assets, the trial court was persuaded by the fact that Schmitt had reported inaccurate values for the real estate. But this inaccuracy led to an overvaluation of Schmitt's assets, not to a concealment of assets. Thus, the overvaluing actually supported Schmitt's claim of full disclosure.
 {¶ 21} The trial court also found the disclosure lacking because Azarova did not know the meaning of the acronyms IRA and TSP that modified two of Schmitt's accounts listed as assets. But Schmitt's use of acronyms in this situation did not evince an intent to conceal the nature of the assets. And the fact that Azarova did not understand the meaning of the acronyms was not legally significant where Schmitt established that he had fully disclosed his assets in the attachment to the agreement.
 {¶ 22} In summary, Schmitt disclosed his assets and their values in an attachment to the agreement. Where there was no evidence that Schmitt had omitted assets from the list or that he had undervalued or mischaracterized any assets, the trial court's conclusion that Schmitt had failed to prove full disclosure of his assets was not supported by the evidence. Therefore, the court erred in invalidating the prenuptial agreement on this basis.
 {¶ 23} But the trial court also found that Azarova had not entered into the agreement freely because of overreaching, coercion, duress, and fraud. We provide *Page 8 
these terms with their generally accepted meanings.[9] Thus, "the term `overreaching' is used in the sense of one party by artifice or cunning, or by significant disparity to understand the nature of the transaction, to outwit or cheat the other."[10]
 {¶ 24} A presumption of overreaching or coercion arises when a prenuptial agreement is presented a "very short time" before the wedding ceremony, and when "the postponement of the wedding would cause significant hardship, embarrassment or emotional distress."[11]
Additionally, when, as in this case, a prenuptial agreement "provides disproportionately less than the party challenging it would have received under an equitable distribution, the party financially disadvantaged must have a meaningful opportunity to consult with independent counsel.[12]
 {¶ 25} The trial court found overreaching for several reasons, including the fact that Azarova did not have a meaningful opportunity to consult with independent counsel. The evidence was conflicting on this issue, but the trial court was free to believe Azarova's testimony that she did not have the knowledge or money to locate and retain her own attorney. The trial court also found overreaching based upon Schmitt's knowledge of and experience with the distribution of property in divorce, in contrast to Azarova's total lack of knowledge. The court found that Schmitt had exploited this disparity when he failed to explain to Azarova that she could have had an equitable interest in the active appreciation of the property under Ohio law. The court also found relevant Azarova's limited knowledge of the English language. All these facts, viewed together, supported the trial court's finding of overreaching. *Page 9 
 {¶ 26} The court found coercion and duress based upon Schmitt's presentation of the agreement to Azarova only a few days before the wedding and only two weeks before her fiancée visa would have expired. Azarova testified that she had felt that she could not refuse to sign the agreement because the consequences would have been that Schmitt would not have married her and she would have had to go back to the Ukraine unmarried. She claimed that she had cried when they met with Schmitt's attorney. These facts supported the court's finding of coercion and duress.
 {¶ 27} The trial court also invalidated the agreement on the basis of fraud. Azarova testified that Schmitt had told her that the purpose of the prenuptial agreement was "to protect [her] from his family in case of his unexpected death" and "to quickly end the marriage in case * * * we break up [a] month after getting married." The court relied on this testimony in holding that Schmitt had procured the agreement by fraud.
 {¶ 28} But these statements did not evince the intent to deceive required to prove fraud, where the statements did reflect parts of the agreement. For example, article eight of the agreement provided Azarova with a life estate in the marital residence if she remained married to Schmitt upon his death. Because Schmitt and his family wanted ownership of the house to remain with the Schmitt family, the life estate did provide Azarova with some protection. Also, the agreement provided Azarova with $5000 and a plane ticket back to the Ukraine, even if the parties were to divorce only a month after they were married. Under these circumstances, the statements Schmitt made to Azarova about the purpose of the agreement did not, as a matter of law, rise to the level of fraud. *Page 10 
 {¶ 29} Nonetheless, the trial court's conclusion that the prenuptial agreement was tainted by overreaching, coercion, and duress was supported by the evidence. Therefore, we uphold the trial court's decision invalidating the agreement on these grounds. Accordingly, we overrule the first assignment of error.
 {¶ 30} In his second assignment of error, Schmitt argues that the trial court abused its discretion in rejecting the magistrate's decision to enforce the agreement, where that decision was supported by some evidence. Schmitt maintains that the magistrate was in the best position to judge the credibility of the witnesses because the magistrate was able to view the witnesses as they testified. Further, Schmitt claims that the trial court erred in sustaining Azarova's objections prior to adopting its own findings of fact and conclusions of law.
 {¶ 31} We find no merit to Schmitt's contentions. "The trial court does not sit in the position of an appellate court when reviewing a magistrate's decision. The magistrate's role is to assist the trial court, and the magistrate's decision is only a recommendation."[13]
 {¶ 32} In reviewing objections to a magistrate's decision, a trial court has the responsibility to conduct a de novo review of the evidence and to determine whether the magistrate properly assessed the facts and applied the correct law.[14] Civ.R. 53 specifically provides the trial court with the authority to reject the magistrate's decision in whole or in part.[15] Therefore, the court may substitute its judgment for that of the magistrate.[16] A trial court is not required to defer to a magistrate's factual findings or legal conclusions if it does not agree with them.[17] *Page 11 
 {¶ 33} In this case, after a de novo review of the evidence, the trial court rejected the magistrate's decision and the supporting findings of fact and conclusions of law. The court then entered its own findings of fact and conclusions of law to explain the basis of its decision. These findings of fact were supported by the record, and they also supported the court's legal conclusion that the agreement was not enforceable on the basis of overreaching, coercion, and duress. Under these circumstances, we hold that Schmitt's second assignment of error is meritless, and we overrule it.
 {¶ 34} Accordingly, we affirm the judgment of the trial court invalidating the prenuptial agreement and providing for an equitable division of the marital assets.
Judgment affirmed.
HILDEBRANDT, P.J., and HENDON, J., concur.
RALPH WINKLER, retired, of the First Appellate District, sitting by assignment.
[1] See Gross v. Gross (1984), 11 Ohio St.3d 99, 464 N.E.2d 500.
[2] Id. at paragraph two of the syllabus.
[3] See Gearheart v. Cooper, 1st Dist. Nos. C-050532 and C-060170,2007-Ohio-25. at ¶ 15.
[4] See Fletcher v. Fletcher, 68 Ohio St.3d 464, 467, 1994-Ohio-434,628 N.E.2d 1343.
[5] Id. at paragraph one of the syllabus.
[6] Id. at 467.
[7] See Gross at 105.
[8] See Fletcher at 468.
[9] Gross at 105.
[10] Id.
[11] Id. at 470.
[12] Fletcher at paragraph two of the syllabus.
[13] Sweeney v. Sweeney, 10th Dist. No. 06AP-251, 2006-Ohio-6988, at ¶ 14.
[14] Id., citing DeSantis v. Soller (1990), 70 Ohio App.3d 226, 232,590 N.E.2d 886.
[15] See Civ.R. 53(E)(4)(b), now Civ.R. 53(D)(4)(b).
[16] See Sweeney at ¶ 14.
[17] Id. at ¶¶ 14-15. *Page 1