[Cite as *Mahoney v. Moskowitz*, 2026-Ohio-1638.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

BRIDGET LEA MAHONEY,   :   APPEAL NO. C-250228
                TRIAL NO. DR-2300998

  Plaintiff-Appellant,   :

vs.            :

ROBERT A. MOSKOWITZ,   :   *JUDGMENT ENTRY*

  Defendant-Appellee.   :


This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 5/6/2026 per order of the court.**


**By:**_____
   **Administrative Judge**

[Cite as *Mahoney v. Moskowitz*, 2026-Ohio-1638.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| BRIDGET LEA MAHONEY, | : | APPEAL NO. | C-250228 |
| | | TRIAL NO. | DR-2300998 |
| Plaintiff-Appellant, | : | | |
| | | | |
| vs. | : | | |
| | | | |
| ROBERT A. MOSKOWITZ, | : | *O P I N I O N* | |
| | | | |
| Defendant-Appellee. | : | | |

Appeal From: Hamilton County Court of Common Pleas, Domestic Relations Division

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 6, 2026

*Stagnaro Hannigan Koop, Co., LPA* and *Michaela M. Stagnaro*, for Plaintiff-Appellant,

*Moskowitz & Moskowitz, LLC, Rachel M. Alexander* and *Joel S. Moskowitz*, for Defendant-Appellee.

**KINSLEY, Presiding Judge.**

**{¶1}** When Bridget Mahoney ("Wife") and Robert Moskowitz ("Husband") divorced, the Domestic Relations Division of the Hamilton County Court of Common Pleas determined that a premarital agreement ("prenup") signed on their wedding day was valid and enforceable, because no family or friends attended the ceremony and it could easily have been postponed. The trial court then applied the terms of the prenup and determined that certain assets, including the proceeds of the sale of Husband's family businesses and silver bars paid by a business client, were Husband's separate property. Recognizing the resulting disparity in income, the trial court awarded spousal support to Wife but ordered that it end after approximately three years.

**{¶2}** Wife appeals these aspects of the trial court's judgment. For the reasons we explain in this opinion, we reject Wife's arguments and affirm the judgment of the trial court.

### *Background*

**{¶3}** Husband and Wife were married on May 3, 2008, after dating for approximately eight years. Husband owned an interest in two family businesses, Moskowitz Brothers, Inc. ("MBI") and Moskowitz Brothers, Company ("MBC").[1] Wife engaged in meaningful volunteer work but was otherwise unemployed. Wife separated from Husband in June of 2023 and ultimately filed for divorce.

**{¶4}** Three issues arose during the parties' divorce. The first concerned the enforceability of a prenup Husband and Wife executed the day of their wedding. By its terms, the prenup indicated that Husband had been represented by counsel in negotiating the agreement but Wife "ha[d] chosen not to be represented." Despite her

---

[1] Founded in 1901, MBI was a family business which recycled scrap metal, and MBC was a metal brokerage company.

lack of representation, two provisions in the prenup were crossed out and initialed by each party, indicating that Husband and Wife had agreed to modify its terms.

{¶5} As executed, the prenup stated that each party had fully disclosed to the other the "nature, extent, and probable values of their property." It was accompanied by two exhibits that listed Husband's and Wife's individual assets and liabilities. To the extent there were any discrepancies between the value of the assets listed on the exhibits and their current market value, the prenup indicated the disclosures in the exhibits were approximate and "not necessarily exact." Under the agreement, all property "owned or acquired by each party prior to the date of marriage (including but not limited to the assets listed on [the exhibits]) and any appreciation thereof" was to remain the party's separate property. In addition, the prenup also provided that "any liability attributable to either party's separate property, whether presently existing or hereafter accruing, shall be satisfied exclusively from and out of that party's separate property."

{¶6} Wife contended that she was coerced to sign the prenup, because Husband presented it to her for the first time as they were driving to their wedding. She accordingly argued that the prenup was unenforceable. On September 12, 2023, the trial court conducted a hearing on Wife's claim.

{¶7} Husband and Wife both testified at the hearing. Husband testified that he and Wife began dating in 2000, when he was in the process of divorcing his first wife. Husband and Wife became engaged in 2005 and purchased a home on Ironwood Court ("Ironwood") together in September of 2007. Husband moved into Ironwood, while Wife remained in a home she owned on Mesa Place ("Mesa"). As Husband and Wife's engagement dragged on, Husband was concerned they would not get married.

{¶8} Husband testified that he had an attorney prepare the prenup in the

middle of 2007. He discussed the prenup with Wife several times to obtain her asset and debt information, which was included in an exhibit to the prenup. He could not specifically recall asking Wife if she wanted an attorney, but he introduced a letter to his attorney dated May 1, 2008, in which he wrote, "Enclosed is the update of assets and liabilities – I don't think Bridget wants to use a lawyer." The letter attached two updated exhibits, which included changes to Wife's assets and liabilities. Husband testified that he would not have written the letter if he had not spoken to Wife about the prenup and that he would not have known what Wife's assets and liabilities were without asking her.

{¶9} According to Husband, Wife applied online for a marriage license, which was dated April 30, 2008. As of that date, they had not chosen a wedding date or an officiant, as neither detail was listed on the marriage license. It was not until May 1, 2028, or perhaps after that date, that Wife selected their wedding date. Once Husband knew when they would be getting married, he contacted his attorney to update the prenup.

{¶10} Husband admitted that he did not present the prenup to Wife until just before their wedding ceremony. When asked why he waited, Husband responded, "It could have been – we don't live together. We probably didn't see each other. . . . And also I mean it had to be updated. The prenup had to be updated."

{¶11} Describing the wedding, Husband said he and Wife were married at a downtown office building, no friends or family were present, and a stranger served as the witness. Afterwards, Husband and Wife ate lunch and dinner together and stayed in a hotel for one or two nights. There was no formal reception or gathering.

{¶12} Husband also testified about his business interests as they related to the prenup. Husband was clear that he had fully disclosed his interests and assets to Wife

5

in both the prenup itself and in conversations before their marriage. Husband acquired stock in MBI in 1989, which gave him 16 percent ownership in that company. He later acquired stock in MBC around 2000. During Husband's first divorce, his ex-wife ("Ex-Wife") sought part of his ownership in MBC. To resolve the claim, he was required to pay Ex-Wife a portion of the proceeds upon the sale of MBC. Husband told Wife about Ex-Wife's claim, as he began dating Wife during his first divorce and often confided in her.

{¶13} Wife largely confirmed Husband's testimony about the details of the wedding and how the prenup was signed. Wife agreed that they obtained an online marriage license, had a stranger witness their vows, and did not have a wedding reception. Wife hired a justice of the peace to conduct the ceremony. Even though no family or friends were in attendance, Wife did tell her loved ones that she and Husband were getting married. To celebrate, her daughters ordered strawberries and wine to be sent to Husband and Wife's hotel room after the ceremony, and one of them came to town from college afterwards. Wife also spent money boarding her dog while she and Husband stayed in the hotel.

{¶14} Wife testified that she knew nothing about the prenup until Husband gave it to her on the drive to the wedding, which left her shocked and unable to think straight. She could not remember if she signed the prenup before or after the ceremony and did not remember reading the entire document.[2] However, she acknowledged signing the prenup and initialing each page. She also admitted that two provisions had been crossed out and initialed.

{¶15} Wife further testified that the exhibit attached to the prenup did not

---

[2] This testimony conflicted with Wife's statement at an earlier deposition that she had read the entire prenup before signing it.

accurately reflect her assets and liabilities. In particular, the exhibit did not indicate that she had sold her Mesa home the morning of the wedding. Wife also believed the prenup omitted a significant liability of Husband's. According to Wife, she did not learn of Ex-Wife's claim to Husband's interest in MBC until November 4, 2018, well after she married Husband. Wife also disputed that Husband had asked her whether she wanted an attorney to review the document but admitted that she had been through two previous divorces.

{¶16} During her testimony, Wife was asked why she did not reschedule the wedding to have time to look over the prenup in more detail. She answered that she was not in the right mindset to cancel or delay the wedding because she was in shock.

{¶17} After considering Husband's and Wife's testimony, the trial court found the prenup to be valid and enforceable. In its April 5, 2024 entry, the trial court concluded that there was no clear evidence the prenup had been procured by fraud, duress, coercion, or overreaching. Instead, given the circumstances of Husband and Wife's wedding, it found that neither party would have faced significant hardship, embarrassment, or emotional distress if the wedding had been postponed so that Wife could review the prenup with an attorney. The trial court also cited Wife's experience navigating two prior divorces and the fact that the parties had fully disclosed their assets and liabilities to one another before executing the prenup. It accordingly denied Wife's challenge to the prenup's enforceability.

{¶18} The second issue the trial court considered in resolving the parties' divorce was the division of Husband's and Wife's assets. The trial court conducted a trial on November 1, 2024, and December 23, 2024, at which Husband and Wife both testified. In addition, Husband called two financial witnesses—Mark Wernke and Mallory Ashbrook.

{¶19}  Wife testified that she had worked as a news anchor prior to marrying Husband and had since been actively engaged as a volunteer with domestic violence prevention organizations.  She decided to leave Husband in November of 2022.  She secured an apartment on April 21, 2023, and moved in on June 13, 2023.  She waited to leave because of finances.

{¶20}  Wife was aware that Husband was a partial owner of MBI and MBC, which were family businesses.  According to Wife, the percentage of Husband's ownership interest in the companies changed in 2009, when Husband's cousins and co-owners retired.  Wife was aware that there were 30 silver bars in a safe at Ironwood.  Husband indicated the silver bars were paid to MBC by one of its clients, but Wife thought they were a personal investment.  She admitted to testifying at an earlier deposition that the bars came from a client of MBC's as payment for its services.  She took 15 of the bars with her when she moved out of Ironwood.

{¶21}  Wife also testified about Husband's bank accounts.  Husband deposited funds into several different accounts at UBS bank.  Wife had access to the UBS accounts because she helped Husband set up online banking, and he never changed the passwords.  She was aware that one of the accounts—UBS account x6344—held contributions to a defined benefit retirement plan established for Husband's benefit.

{¶22}  Husband also testified about his bank accounts, the silver bars, and his ownership interests in MBI and MBC.  As to the latter, Husband indicated that he obtained approximately 57 shares in MBI in 1989 and acquired an interest in MBC around 2000.  At the time, two of his cousins held the remaining shares.  When they retired in 2009, the company purchased their shares and deposited them into the company's treasury fund.  Although Husband's ownership percentage increased as a result, Husband testified that he never purchased or received additional shares.

8

{¶23} In 2018, Husband sold MBI and deposited the proceeds of the sale into various UBS bank accounts. Husband paid the tax liability for the sale of MBI from a joint bank account he held with Wife. After the sale of MBI, Husband formed RM Advisory Group ("RM"). RM agreed to provide brokerage services to the company that purchased MBI for the next three years. For these services, RM would receive $170,000 per year. Husband received income from RM from 2018 to 2021, which he spent while he was married to Wife. Husband retired in 2021.

{¶24} As to the silver bars, Husband testified that MBC acquired about 30 100-ounce silver bars as payment from a customer. The bars were originally kept in a company safe deposit box, but Husband eventually brought them home. He currently had 15 bars in his possession.

{¶25} Regarding the UBS bank accounts, Husband testified that he maintained UBS account x6344 in RM's name as a defined benefit retirement account. The account was funded with the proceeds of the sale of MBI and from RM's brokerage service fees. Wife had access to the statements for the account, knew RM contributed to the account, and never expressed a concern about this arrangement.

{¶26} Husband also testified regarding UBS account x3670, a bank account jointly held by Husband and Wife. According to Husband, on April 12, 2023, he transferred 350 shares of META stock from a separate account into the joint UBS account. He did this because, two months earlier, Wife began complaining that she would not have any money if Husband died, and their arguments over this issue were affecting the marriage. When he transferred the stock, Husband did not know Wife was planning to leave him shortly thereafter. Had he known, he would not have made the transfer. Husband transferred the stock back to his separate account after Wife left Ironwood because he feared she would take it.

9

**{¶27}** Mark Wernke, the accountant for Husband's family businesses, testified that Husband did not acquire additional shares in MBI after he married Wife. Although Husband's ownership percentage increased after Husband's cousins retired, the number of shares Husband owned in the company remained the same. When pressed by Wife, Wernke could not discuss the documents he reviewed to reach this conclusion because he owed a duty of confidentiality to clients other than Husband. Nonetheless, he was certain the information was accurate.

**{¶28}** Mallory Ashbrook testified as an expert witness in tracing Husband's assets.[3] Ashbrook is a certified public accountant specializing in financial forensics and holds an inactive law license. After reviewing thousands of pages of bank statements, Ashbrook prepared a detailed report that traced the funds in UBS accounts x6371, x3670, x6344, and x6536. She testified to the percentages of separate and marital property in each account. She also submitted a tracing schedule, reflecting the percentages of Husband's separate property in the UBS accounts.

**{¶29}** On March 21, 2025, the trial court issued a written decision dividing the parties' assets and liabilities according to the prenup. Regarding the parties' assets, the trial court determined that, for all assets except the META stock, the parties separated on June 13, 2023—the day Wife moved out of Ironwood. Applying the prenup, the trial court held that the proceeds from the sale of MBI and MBC and the silver bars were Husband's separate property. It agreed with Ashbrook's expert testimony, specifically finding her to be credible, and held that the percentages Ashbrook identified as Husband's separate property in the UBS accounts were indeed his. As to the META stock transfer to UBS account x3670, the trial court determined

---

[3] Wife did not call any experts to testify on her behalf.

the date of division to be April 12, 2023, because Wife misrepresented her intentions to induce Husband to make the transfer.

**{¶30}** Regarding the parties' liabilities, Wife contended that Husband had paid the tax liabilities for MBI and MBC from marital funds in the tax years 2012, 2015, 2016, 2017, and 2018. Wife accordingly argued that she was entitled to an equalization payment under the prenup, as the agreement required liabilities on separate property to remain separate. The trial court rejected this argument. Based on the testimony presented at trial, it found that the companies' taxes had been paid from Husband's income from the businesses and that Wife had agreed to assume the tax liability by filing joint tax returns with Husband.

**{¶31}** The final issue the trial court resolved was spousal support. At the time of the parties' divorce, neither Husband nor Wife were employed. Both were of retirement age and drawing Social Security. Husband's monthly Social Security exceeded Wife's by approximately $2,000 per month, and he had greater assets on hand to support his living expenses. The trial court accordingly ordered Husband to pay Wife $3,000 per month until October 1, 2028.

**{¶32}** Wife appealed.

## *Analysis*

**{¶33}** On appeal, Wife raises five assignments of error, arguing that the trial court erred by (1) finding the prenup to be valid and enforceable, (2) finding the UBS accounts to be primarily Husband's separate property, (3) finding the silver bars to be Husband's separate property, (4) rejecting Wife's claim that she was entitled to an equalization payment for the taxes incurred for MBI and MBC, and (5) setting a termination date for Wife's spousal support.

### A. The Validity of the Prenup

**{¶34}** In Wife's first assignment of error, she argues that the trial court erred in upholding the validity of the parties' prenup. She raises two specific issues that she contends undermine the agreement's enforceability. First, she argues that the prenup was the product of coercion, as Husband presented it to her for the first time on the day of their wedding without sufficient time for her input. Second, she contends that Husband did not fully disclose his assets and liabilities, including his specific ownership shares in MBI and MBC, and that as a result she lacked full knowledge and understanding of Husband's property before signing the agreement.

**{¶35}** It is well-settled in Ohio that public policy allows for the enforcement of premarital agreements. *Gross v. Gross*, 11 Ohio St.3d 99 (1984), paragraph one of the syllabus. These agreements are contracts subject to the general rules of contract interpretation, as well as special rules governing prenups. *Fletcher v. Fletcher*, 68 Ohio St.3d 464, 467 (1994), citing 2 Williston on Contracts, Section 270B (3 Ed. 1959). Under these principles, premarital agreements are enforceable "(1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge, and understanding of the nature, value and extent of the prospective spouse's property; and, (3) if the terms do not promote or encourage divorce or profiteering by divorce." *Gross* at 105.

**{¶36}** An appellate court will uphold a trial court's findings regarding the validity of a prenuptial agreement if they are supported by competent evidence. *Downing v. Downing*, 2023-Ohio-2673, ¶ 21 (1st Dist.). Moreover, we "indulge all reasonable presumptions consistent with the record in favor of lower court decisions on questions of law." *Fletcher* at 468. We must affirm a trial court's finding of validity "if there is some evidence in the record to establish that the[se] elements have been

satisfied," and we "presume that the trial court believed the testimony that supported the enforceability of the agreement." *Id.*

### 1. *Coercion and Overreaching*

**{¶37}** Wife first takes issue with the trial court's findings as to the absence of coercion and overreaching. Coercion occurs when "one party is constrained by subjugation to another to do what his free will would refuse." *Downing* at ¶ 38. Overreaching occurs when one party, "by artifice or cunning, or by significant disparity to understand the nature of the transaction," attempts to "outwit or cheat the other." *Gross* at 105.

**{¶38}** The trial court concluded that Wife signed the prenup voluntarily and without coercion or cheating on Husband's part based on a number of factual findings. First, the trial court observed that Wife had been divorced twice before and therefore had experience with the implications of property distribution. This finding was supported by competent evidence, as Wife herself testified to her prior divorces. Next, the trial court found that Wife could easily have postponed the wedding to seek legal advice about the prenup. Husband and Wife had not expended money in furtherance of a wedding ceremony or reception, outside of the cost of a hotel room, and had no family or friends in attendance. This finding, too, was supported by evidence in the record, as both Husband and Wife described their wedding as a simple affair witnessed only by a stranger. Next, the trial court observed that Wife in fact had an opportunity to review the prenup and make changes, as she and Husband crossed out two provisions and initialed each modification. The parties entered the prenup into the record, and it supports this finding—as it clearly reflects the parties' edits to its content. Finally, the trial court noted that the late presentation of the prenup on the way to the wedding was not the product of any desire to pressure Wife on Husband's

part. Wife had not chosen the actual wedding date until very close to the day of the ceremony, leaving Husband little time to draft the agreement with his attorney. This factual finding is also supported by the evidence at trial, as Husband testified to the timeline by which Wife applied for the online marriage license and later selected the wedding date.[4]

**{¶39}** We cannot reweigh the evidence for and against the prenup's validity. *See Downing*, 2023-Ohio-2673, at ¶ 31 (1st Dist.). Because competent, credible evidence supported the trial court's factual findings that the prenup did not result from coercion or overreaching, we reject Wife's challenge to that aspect of the trial court's judgment

### 2. *Lack of Disclosure*

**{¶40}** Wife next argues that the prenup was invalid because it was unsupported by full and accurate disclosures of the parties' financial positions. She advances three arguments in this regard. First, she contends that the exhibit to the prenup that enumerated her assets and liabilities was inaccurate, because it contained the Mesa home that she sold the morning of her marriage to Husband. Second, she takes issue with the sufficiency of Husband's disclosure of his ownership interest in MBI and MBC. The prenup exhibit that listed Husband's assets and liabilities indicated that Husband owned an interest in both companies but set forth a monetary value for those interests rather than the number of shares Husband owned in each company or what percentage of each company Husband's ownership interest represented. Third, Wife contends that Husband failed to disclose his obligation to

---

[4] Notably, the trial court specifically found Husband's testimony to be credible. As the trial court was in the best position to observe the witnesses and assess their demeanor, we defer to the trial court's determination as to credibility. *See Tyra v. Griffith*, 2025-Ohio-912, ¶ 40 (1st Dist.).

pay Ex-Wife a portion of the proceeds of the MBC sale as a liability.

**{¶41}** The party challenging the validity of a prenup typically has the burden of establishing that it was executed without full disclosure of the parties' assets and liabilities. *Azarova v. Schmitt*, 2007-Ohio-653, ¶ 15 (1st Dist.). But where, as here, the prenup provides the challenging party with disproportionately less than an equitable distribution, the party claiming validity of the agreement has the burden of proving full disclosure. *Fletcher*, 68 Ohio St.3d at 467. A party can prove full disclosure by exhibiting an attachment to the agreement listing the parties' assets or by showing "there had been a full disclosure by other means." *Gross*, 11 Ohio St.3d at 105. However, "the focus of the full-disclosure inquiry is whether a spouse has concealed assets." *Azarova* at ¶ 16.

**{¶42}** Full disclosure in the context of a premarital agreement need not be a "drastically sweeping disclosure." *Heimann v. Heimann*, 2022-Ohio-241, ¶ 33 (3d Dist.). In other words, the spouse is not required to know the other spouse's exact means; a general idea of the person's wealth and assets will do. *Id.*

**{¶43}** Applying these principles, the trial court rejected Wife's contentions, finding that both parties had made a full disclosure of their financial positions before the prenup was signed. To the extent there were minor discrepancies between the disclosed value of Husband's and Wife's assets and their actual value, the trial court cited the provision in the prenup indicating the values were intended to be approximate, not exact. The trial court also found that Husband frequently discussed his financial status with Wife prior to the prenup.

**{¶44}** These findings are supported by competent, credible evidence. As to Mesa, the prenup exhibit indicated that Mesa was both an asset and liability of Wife's and that she had accrued approximately $115,000 in equity in the property. This was

sufficient to disclose Wife's interest in the property, whether she retained it or sold it. Moreover, because the focus of the full disclosure requirement is to ensure that Wife was aware of Husband's assets, not her own, any discrepancies in Wife's interest in Mesa are immaterial to whether Wife voluntarily executed the prenup. *See Azarova*, 2007-Ohio-653, at ¶ 16 (1st Dist.). Wife surely knew the exact status of Mesa, whether it was in the prenup or not.

**{¶45}** As to Husband's alleged nondisclosure of Ex-Wife's interest in the MBC proceeds, the trial court discounted Wife's testimony that she was unaware of the details of Husband's first divorce. To the contrary, the trial court made a factual determination that Husband discussed his financial situation with Wife during the period of his first divorce and further found Husband to be a credible witness. Those findings were supported by the record. Moreover, the failure to include an encumbrance to an asset, which leads to its overvaluation, is "not a concealment of assets" and will not invalidate a prenuptial agreement. *Azarova* at ¶ 19-20. Thus, we see no reason to depart from the trial court's determination as to Husband's liability to Ex-Wife.

**{¶46}** Finally, with regard to Husband's disclosure of his interests in MBI and MBC, Wife offers no authority for the proposition that Husband was required to disclose the number of shares or percentage of ownership, rather than the value of his interest in the companies. And we can find none. Instead, with regard to the value of a spouse's business interest, courts have rejected the argument "some precise formula" must be used to determine the value that must be disclosed on a prenup. *See Heimann*, 2022-Ohio-241, at ¶ 39 (3d Dist.).

**{¶47}** Here, Husband and Wife had known each other for many years before they were married, and they were married for many years. Husband frequently

discussed his financial affairs with Wife. Husband also disclosed the monetary value of his interests in MBI and MBC in an exhibit attached to the prenup. Under these circumstances, the trial court's finding that Husband made full disclosure to Wife of his assets and liabilities was supported by competent, credible evidence.

{¶48} We overrule Wife's first assignment of error.

### B. Husband's Separate Property

{¶49} In Wife's second and third assignments of error, she argues the trial court erred by finding that the UBS accounts were primarily Husband's separate property and by finding that the silver bars were entirely Husband's separate property. Because these issues rely on common legal standards, we address them together.

{¶50} Generally, we review the appropriateness of a trial court's division of property in divorce proceedings for an abuse of discretion. *Dunn v. Dunn*, 2002-Ohio-6247, ¶ 12 (1st Dist.), citing *Cherry v. Cherry*, 66 Ohio St.2d 348 (1981). When an appeal raises a factual issue as to whether specific property is marital or separate, we apply either the sufficiency or manifest weight standard of review, depending on the nature of the challenge. *Carter v. Carter*, 2024-Ohio-1046, ¶ 19 (1st Dist.). "In reviewing a weight of the evidence challenge, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* In reviewing a sufficiency challenge, we ask whether some evidence exists on each element and whether the evidence on each element satisfies the burden of persuasion. *In re A.B.*, 2015-Ohio-3247, ¶ 15 (1st Dist.).

{¶51} Wife does not specify whether she is challenging the trial court's property characterizations under a sufficiency or manifest weight standard. Thus, for

the sake of completeness, where appropriate, we consider them both, along with whether the trial court abused its discretion.

### 1. The MBI Sale Proceeds

{¶52} Wife first argues that the trial court erred in determining that the funds contained in UBS accounts x6356, x6344, x6371, and x3670 were almost entirely Husband's separate assets.[5] The trial court based its determination entirely on Ashbrook's testimony and her detailed tracing report, which concluded that nearly all of the funds in the bank accounts originated from MBI and MBC. Because MBI and MBC were identified on the exhibit to the prenup, the prenup labeled them as Husband's separate property. Ashbrook therefore merely followed the terms of the prenup by tracing the income Husband derived from the businesses through the UBS accounts. Given this information—the expert report and the prenup itself—the trial court's determination that the bank accounts largely belonged to Husband was supported by sufficient evidence.

{¶53} Moving to the weight of the evidence, we note that Ashbrook's testimony was uncontroverted. Wife did not present any expert of her own, nor did she meaningfully dispute Ashbrook's testimony and report with any alternate accounting. Instead, Wife argues that Ashbrook failed to take into account Husband's inflated ownership percentage of MBI and MBC after Husband's cousins retired.

{¶54} According to Wife, Husband owned 15.5 percent of the family businesses at the time of Husband and Wife's marriage, but that percentage grew to 100 percent after the companies repurchased the cousins' stock. She therefore

---

[5] The trial court awarded 99.6 percent of the funds in UBS account x6536, 99.9 percent of the funds in UBS account x6344, 99.7 percent of the funds in UBS account x6371, and the entirety of the funds in UBS account x3670 to Husband as his separate property.

18

contends that 84.5 percent of Husband's ownership interest in MBI and MBC is martial property, because it accrued after the parties were married. And on this premise, she argues that Ashbrook erred in assuming that all of the funds attributable to MBI and MBC were Husband's, when 42.25 percent of them—half of 84.5—should have been awarded to Wife.

{¶55} The trial court soundly rejected Wife's argument. In particular, the trial court noted that the prenup characterized both Husband's interest in MBI and MBC and any appreciation of that interest to be Husband's separate property. The trial court's determination was supported by the express language of the prenup, as well as the attached exhibit disclosing the monetary value of Husband's ownership interest in the companies. Moreover, both Husband and Wernke testified that, contrary to Wife's unsupported assertion, Husband did not acquire any additional stock after Husband's cousins retired. Rather, the companies repurchased the cousins' shares. While the value of Husband's shares may have appreciated as a result, the prenup indicated that the growth of a separate asset retained its separate character.

{¶56} Given this evidence, the trial court did not abuse its discretion in awarding the proceeds of the MBI sale to Husband.

### 2. Account x6344

{¶57} Wife next argues that account x6344, a defined benefit retirement account held in RM's name, constituted marital property because it was funded with proceeds from the RM brokerage agreement and because she did not agree to the contributions. The trial court rejected Wife's contentions. As to the brokerage agreement, the evidence presented at trial demonstrated that RM, not Husband, was retained to provide services to the purchaser of MBI. Moreover, Ashbrook's report traced these funds directly to the sale of MBI. As to the deposits, Wife admitted that

19

she was aware RM contributed to the retirement account. Sufficient evidence therefore supported the trial court's conclusion that UBS account x6344 was Husband's separate property.

### 3. Account x3670

{¶58} In her next issue, Wife challenges the trial court's decision to apply an earlier date of separation—April 12, 2023—to Husband's transfer of META stock to UBS account x3670. The trial court made this determination based on its conclusion that Wife "improperly coerced Husband to transfer the META stock in an attempt to turn the stock marital, solely so that she would be entitled to half when she left the marriage."

{¶59} "The domestic relations court may use alternative valuation dates to achieve the equitable distribution of marital assets." *Berger v. Berger*, 2004-Ohio-5614, ¶ 12 (1st Dist.). It did so here. Husband testified that he transferred the stock at Wife's repeated suggestion because she feared not having sufficient financial support if he were to die. Wife essentially admitted this was disingenuous, as she planned to leave the marriage when she made the requests. This evidence was sufficient to support the trial court's finding that Wife separated from Husband on April 12, 2023, when he transferred the META stock.

### 4. Account x6356

{¶60} Wife's final argument about the UBS accounts pertains to account x6356. Relying on Ashbrook's report, the trial court found 99.6 percent of the funds in the account to be Husband's separate property. Wife contends—without presenting any evidence of her own—that the account was too commingled to be traced as separate property. We disagree.

{¶61} Separate property "retains its separate nature as long as it is traceable,

regardless of whether it has been commingled with other property." *Boolchand v. Boolchand*, 2020-Ohio-6951, ¶ 25 (1st Dist.). Here, Husband sufficiently traced the funds in UBS account x6356 to his separate property through Ashbrook's uncontroverted report. In addition, Husband introduced thousands of pages of financial statements to support Ashbrook's account tracing. Ignoring this evidence, Wife argues that Husband was unable to answer questions about the nature of several deposits, including a $425,000 deposit from an unknown source and a $25,000 deposit from the joint account. But Husband's lack of memory—understandable, given that he was asked to recall years of financial dealings on the spot—is immaterial, given that Ashbrook's expert report explained the transactions.

**{¶62}** The trial court specifically found Ashbrook's testimony and report to be credible. On that basis, the trial court did not abuse its discretion in determining that 99.6 percent of account x6356 was Husband's separate property.

### C. Silver Bars

**{¶63}** In her third assignment of error, Wife argues that the trial court erred in finding the silver bars to be Husband's separate property. But the evidence presented at trial supported the trial court's conclusion. Husband testified that MBC acquired the silver bars as payment from a customer, and the trial court specifically found Husband to be credible. Given this evidence, the trial court did not abuse its discretion in awarding the silver bars to Husband.

**{¶64}** We overrule Wife's second and third assignments of error.

### D. Equalization Payment

**{¶65}** In her fourth assignment of error, Wife argues that the trial court erred in failing to order an equalization payment for the tax liabilities incurred by MBI and MBC, which Wife contends were paid from marital funds, rather than by Husband's

separate property as required by the prenup. We review the trial court's division of debt in a divorce for an abuse of discretion. *Carter*, 2024-Ohio-1046, at ¶ 13 (1st Dist.).

**{¶66}** Wife argues that the trial court erred by failing to classify the tax liability for Husband's businesses as separate debt. She argues that the parties paid $245,691 over the course of the marriage for taxes incurred on MBI and MBC dividends and $423,821 for taxes owed on the sale of MBI. Because she claims these taxes were paid with marital funds, Wife argues that the trial court abused its discretion in denying her an equalization payment for the portion of the taxes that were derived from her share of marital property.

**{¶67}** Wife is correct that the prenup requires liability on separate property to be paid from separate assets. In this regard, the prenup provides that "Any liability attributable to either party's separate property, whether presently existing or hereafter accruing, shall be satisfied exclusively from and out of that party's separate property." And Wife is correct that MBI and MBC were Husband's separate property, so the tax liabilities they accrued were required to be paid from separate assets belonging to Husband.

**{¶68}** The problem for Wife is that they were. The testimony at trial established that Husband earned an annual salary of approximately $51,000 a year and that Wife was not gainfully employed. Yet the taxes paid for MBI and MBC totaled close to $670,000 across five years—an average of $134,000 per tax year. Husband's marital wages were therefore woefully insufficient to cover the corporate taxes, particularly considering that Husband's income was the only means of providing support for the parties' living expenses. Husband and Wife's tax returns back up this conclusion. They reflect that the tax liabilities could only have been satisfied from distributions from MBI and MBC—which were Husband's separate property. This is

what the trial court concluded when it held that the businesses' tax liabilities were satisfied from Husband's income.

**{¶69}** Given that the evidence presented at trial supported the trial court's application of the prenup provision requiring Husband to pay MBI's and MBC's tax liabilities with his separate property, the trial court did not abuse its discretion in denying Wife's request for a distributive award. We overrule Wife's fourth assignment of error.

### E.  Spousal Support

**{¶70}** In her fifth and final assignment of error, Wife argues that the trial court erred in terminating spousal support in 2028 rather than ordering Husband to pay it indefinitely. We review the trial court's order of spousal support for an abuse of discretion. *Reddy v. Reddy*, 2015-Ohio-3368, ¶ 24 (1st Dist.).

**{¶71}** Pursuant to R.C. 3103.18(C)(1), a trial court may award spousal support that is appropriate and reasonable. A trial court is not obligated to order spousal support for an indefinite duration. *See Dunn v. Dunn*, 2002-Ohio-6247, ¶ 30 (1st Dist.). To the contrary, a court *may* award an indefinite period of support "where (1) the parties have been married for a long duration, (2) the parties are of an advanced age, or (3) a spouse has been a homemaker who has had little opportunity to develop meaningful employment outside the home." *Id.*, citing *Kunkle v. Kunkle*, 5 Ohio St.3d 64 (1990), paragraph one of the syllabus.

**{¶72}** In its order terminating spousal support on October 1, 2028, the trial court specifically considered each factor in R.C. 3105.18(C)(1), including the income of the parties, their relative earning ability, the duration of the marriage, and Wife's employability. An additional and important consideration was Husband's retirement status. At the time of the divorce, Husband was of advanced age and unemployed. His

sole sources of income were Social Security and retirement savings. Wife, on the other hand, was younger, had previously worked in broadcast journalism, and had developed significant contacts in the domestic violence prevention community that she could potentially leverage for gainful employment. Wife had also received interim spousal support during the pendency of the divorce, as well as a lump-sum equalization payment from Husband that approached $100,000.

{¶73} Under these circumstances, the trial court had broad discretion in determining whether to award spousal support, and if so, its amount and duration. It considered the required statutory factors and appropriately took into account the parties' ages and relative financial positions. No authority required the trial court to mandate indefinite spousal support, and we cannot say that its decision to terminate support after approximately three years was an abuse of discretion. We accordingly overrule Wife's fifth assignment of error.

### *Conclusion*

{¶74} The trial court did not abuse its discretion in enforcing Husband and Wife's prenup, nor did it err in dividing the parties' assets and liabilities according to its terms. The trial court similarly did not abuse its discretion in terminating Wife's spousal support in 2028. We accordingly overrule Wife's assignments of error and affirm the judgment of the trial court.

Judgment affirmed.

ZAYAS and BOCK, JJ., concur.